THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
SUNSET BAY, Appellant.

First Department, July 24, 1980

APPEARANCES OF COUNSEL

*Joseph A. Phillips* for appellant.

*Peter D. Coddington* of counsel *(Steven R. Kartagener* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

SANDLER, J.

After denial of a motion to suppress his confession following a hearing, the defendant pleaded guilty to murder in the second degree and was sentenced to an indeterminate term of imprisonment of 15 years to life.

The principal issue on this appeal is raised by defendant's contention that the confession was secured by police methods that violated his rights under the Fifth Amendment to the Constitution of the United States. We agree that the defendant's constitutional rights were violated and, accordingly, vacate the judgment of conviction, grant the motion to suppress the confession, and remand for further proceedings.

On April 16, 1975, a young woman was stabbed to death in the course of a rape. The intensive police investigation that followed discovery of her body failed to disclose evidence pointing to the identity of the killer, but a general suspicion developed with regard to the defendant, a resident of the apartment building in which the body was found, and who was present in the building on the date of the crime.

The investigating police decided to develop a friendly relationship with the defendant. Under the guise of securing his co-operation in the solution of the crime, they talked to him from time to time about the case. The defendant proved eager to co-operate. The practice developed that the investigating detectives would make an appointment to meet the defendant, talk to him and ride with him in their police car. On occasions they took defendant to City Island for dinner. Conversations about the case during these meetings were preceded by *Miranda* warnings which defendant said he understood because of some prior training at the police academy. Defendant

willingly responded to their inquiries and, in furtherance of the investigation, gave evidence to the police, including samples of his pubic hair, his footprints, and his sneakers.

Suspicion of the defendant became more sharply focused on July 15, 1975, when an FBI laboratory report disclosed that defendant's pubic hair was consistent with specimens found under the body of the victim. Moreover, the police concluded that there was no plausible explanation other than guilt for the defendant's knowledge that the deceased had been bound with her own brassiere.

On the morning of August 6, 1975, shortly before noon, the investigating detectives asked defendant to accompany them to the station house where they could again talk to him about the case. Defendant was apparently quite willing to accompany them.

At the station house, tape-recording equipment was set up which recorded much of that which was to occur in the following six hours. From time to time the tape ran out and was not replaced for some period of time, leaving considerable gaps in the recording.

The first tape involved a long discursive conversation between the defendant and one of the investigating officers, Detective Davis, which followed another reading of the *Miranda* rights. In the preliminary phase of the interrogation, there was a rambling discussion about a variety of matters, some connected with the crime and some unrelated to it, in which little of an accusatory character developed.

Following this interview, a determination was made to confront the defendant with the evidence. The following conversation, recorded on the second tape admitted into evidence, is central to the issue presented.

The tape opens with the defendant already sobbing, a development not accounted for in the hearing, and following a gap of undetermined length after completion of the conversation recorded on the first tape. Preliminarily, the detectives undertook by way of questions and affirmative statements to convince the defendant that they had conclusive evidence of his guilt. In part at least the statements they made to the defendant significantly distorted and magnified the evidence already available to the detectives.

Most important of the items of evidence presented to the defendant was the vehemently repeated statement that his

pubic hairs had been found under the body of the deceased. The laboratory report was far more limited, disclosing only that his pubic hairs were consistent with those found. To what extent the other police assertions with regard to evidence were inaccurate is less clearly established in this record. It seems likely, however, that their references to blood stains and footprints also exaggerated the significance of the information available to them.

It is, of course, clear that police deception by itself does not invalidate a resulting confession, although it is relevant where accompanied by other coercive factors. (See, e.g., *Spano v New York,* 360 US 315; *Lisenba v California,* 314 US 219, 237; *Robinson v Smith,* 451 F Supp 1278.)

After this preliminary, at least partially successful, effort to persuade the defendant of the conclusive evidence of his guilt in their possession, the investigating officers undertook a sustained effort over a period of several hours to induce the defendant to confess. Operating in relays, this period was dominated by repeated exhortations to the defendant to confess, in which a variety of psychological techniques were used, varying in approach and intensity of language. Appeals were made to the defendant's religious principles, to his superstitious fears, to his sense of his worth as a man, and to his ethnic pride. Gruesome color photographs of the deceased were exhibited to him. He was asked to contemplate what would occur if he, as a result of a similar impulse, should kill his girlfriend. And it was suggested that if he were to kill again, he might be the victim of mob violence.

From time to time the effort developed high emotional intensity. The tenor of some of the proceedings is perhaps suggested by the following statements to the defendant by one of the interrogating detectives. "(Are you crazy?) man, why don't you tell them to get it over with? these people got you up tight. They got you up tight, man. At least, you can say uh * * * well uh * * * Say anything—say any foolish thing. I must have done that without even thinking."

On several occasions the defendant asked for an opportunity to speak to a woman friend. This was responded to variously by the statement that the police had been unable to contact her, the truthfulness of which is unclear, and by arguing that such a conversation could not possibly be helpful. At different intervals defendant stated that he was suffering from severe headaches and requested aspirins, which were refused him. It

was explained at the hearing that the detective was fearful that he might not be able to prove what medication had been given.

The main theme pursued by the police, and one that appears to have been the primary factor inducing the confession, requires detailed discussion.

In substance the police took the position that they had conclusive evidence of the defendant's guilt and could arrest him without any interrogation at all except that they were convinced that he was not a bad man who had done this terrible thing maliciously. They believed that the defendant must have been sick when this occurred and that it may well have occurred during the course of a blackout, accounting for his inability to remember the events. They thought he required treatment. The view was expressed that he should not go to jail and on one occasion indeed he was told that he would not go to jail.

The police repeatedly said that the defendant should be hospitalized and given treatment to eliminate the problem that had caused him to commit the criminal act. The hospital would be a nice hospital, one to which he could bring his personal belongings and where he could be visited by his girlfriend who need not know the reason he was there, and his stay would be brief. However, in order to make it possible for him to receive such treatment and to be hospitalized, it was necessary for him to help the police by recalling the events that had occurred. Otherwise they would not be able to help him. It was pointed out to him that their recommendations to the District Attorney "carry a lot of weight."

From an examination of the record, it seems clear that the defendant was in fact persuaded that his confession would be followed by hospitalization in which he would receive necessary treatment. This is clearly confirmed by the fact that at a time shortly before his inculpatory statements he asked whether he could take his personal belongings to the hospital and whether he could be visited there by his girlfriend without her knowing the reason for his presence there. The police assured him that all of this would be possible.

Whether the defendant in fact was led to believe that he would not be arrested and prosecuted for the crime is less clear. Certainly that is a possibility. Whether or not he in fact so believed, however, we think it highly probable that he was effectively persuaded that he would be treated with signifi-

cantly greater leniency if he confessed than if he did not. For only if he confessed would the police be able to make the recommendations that would help him.

The concern of the interrogating police officers to solve the terrible crime that had occurred is fully appreciated. Nonetheless, we are persuaded that the confession which resulted from the events described above violated the defendant's constitutional rights against self incrimination under the Fifth Amendment to the Constitution.

The leading authority on this issue remains *Bram v United States* (168 US 532). The court there reversed the conviction of a defendant charged with the murder of three persons aboard ship because there had been admitted into evidence a statement by him in response to the following comment of an interrogating detective: "If you had an accomplice you should say so, and not take the blame of this horrible crime on your own shoulders."

The Supreme Court held the statement to have been involuntary and that its admission in evidence violated the command of the Fifth Amendment to the Constitution that no person "shall be compelled in criminal cases to be a witness against himself." Quoting from 3 Russell on Crimes (6th ed, p 478) the court set forth the governing rule as follows (at pp 542-543): " 'But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * * A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.' "

The precise rule set forth in *Bram* has been restated and explicitly quoted with approval by the Supreme Court in a series of recent cases. (See, e.g., *Malloy v Hogan,* 378 US 1, 7; *Shotwell Mfg. Co. v United States,* 371 US 341, 347; *Brady v United States,* 397 US 742, 753; *Hutto v Ross,* 429 US 28, 30.)

Significantly, in *Malloy v Hogan (supra)* the Supreme Court held for the first time that the protection against self incrimination set forth in the Fifth Amendment applies fully to State criminal trials. And, in *Miranda v Arizona* (384 US 436, 461-462) the Supreme Court specifically held for the first time

since *Bram* that the privilege against self incrimination embodied in the Fifth Amendment applies to involuntary confessions.

Thus, the test for determining whether the confession here was voluntary is that set forth in the above-quoted language from *Bram.*

Notwithstanding the unqualified phrasing of the rule, some Federal appellate decisions have expressed the view that it is not to be applied with what one opinion called "wooden literalness." *(United States v Ferrara,* 377 F2d 16, 17, cert den 389 US 908; see, also, *United States v Frazier,* 434 F2d 994; *United States v Glasgow,* 451 F2d 557, 558.)

When these and similar decisions are examined, however, it is apparent that none involved inducements comparable to those disclosed in this record. Thus, it has been held to be constitutionally permissible for a Federal agent to state that the defendant's co-operation would be made known and there might be some consideration given by the United States Attorney *(People v Frazier, supra);* that if he co-operated with the United States Attorney he might possibly get reduced bail *(United States v Ferrara, supra);* that the officer has heard of cases in which co-operating defendants "have received a break so to speak" *(People v Glasgow, supra).*

Nothing in these authorities raises any question as to the controlling impact on the facts here presented of the principle set forth in *Bram* and repeatedly reaffirmed by the Supreme Court in the cases cited above. (See, also, *Robinson v Smith,* 451 F Supp 1278, *supra; United States ex rel. Caserino v Denno,* 259 F Supp 784; *United States ex rel. Williams v Fay,* 323 F2d 65; *Grades v Boles,* 398 F2d 409.)

The question presented has been the subject of innumerable decisions in State appellate courts. Minor variations in approach are apparent between State courts which quite literally apply the rule that confessions are involuntary if induced by promises, however slight, and those that qualify that rule to some extent. However, as developed in the overwhelming majority of State appellate decisions, the rule as applied is incompatible with the acceptance as voluntary of the confession at issue here. (See, e.g., *Commonwealth v Meehan,* 387 NE2d 527 [Mass]; *People v Tanser,* 75 Ill App 3d 482; *State v Biron,* 266 Minn 272; *State v Mullin,* 249 Iowa 10; *Womack v State of Alabama,* 281 Ala 499.)

Typical of the principle developed in the State decisions is the following observation in *Commonwealth v Meehan (supra,* p 534): "An officer may suggest broadly that it would be 'better' for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past. What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence. [Footnotes omitted.]"

The state of the law on this issue in New York is less clear than in most other States that have addressed the question. In early decisions, the Court of Appeals formulated the rule in language virtually identical with that quoted above from *Bram.* (See *People v McMahon,* 15 NY 384; *People v Phillips,* 42 NY 200.)

In 1881, the Code of Criminal Procedure was enacted. Section 395 provided in part that a defendant's confession can be given in evidence against him "unless made upon a stipulation of the district attorney that he shall not be prosecuted therefor". In the relatively few cases arguably presenting the question thereafter to the Court of Appeals, the issue appeared to have been determined on the basis of the statutory language. (See *People v Deacons,* 109 NY 374, 377; *People v Chapman,* 224 NY 463, 479.) An examination of these opinions makes it doubtful that the factual conclusions underlying them squarely presented the kind of issue with which we are concerned.

However these cases may be interpreted, it is now clear, as it was not then, that the issue concerns the Fifth Amendment to the Constitution of the United States and that the controlling principle of law is that described above.

In September, 1971, CPL 60.45 replaced section 395 of the Code of Criminal Procedure. CPL 60.45 (subd 2, par [b]) defines a confession as "involuntarily made" in pertinent part when obtained from the defendant:

"(b) By a public servant engaged in law enforcement activity or by a person then acting under his direction or in cooperation with him:

"(i) by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself; or

"(ii) in violation of such rights as the defendant may derive from the constitution of this state or of the United States."

Indisputably, the standard set forth in CPL 60.45 (subd 2, par [b], cl [i]) is phrased differently than the Fifth Amendment standard established by the United States Supreme Court. Even so, it would be our view that the facts set forth in the record would be a violation of the statutory standard as well. (Cf. *People v De Jesus,* 63 AD2d 148.) In any event, as already observed, a statement secured from the defendant in violation of the Fifth Amendment is not "voluntary." And that principle is explicitly stated in CPL 60.45 (subd 2, par [b], cl [ii]).

We also believe that the circumstances under which the statement was secured violated as well the defendant's rights under the due process clause of the Fifth Amendment. A familiar statement of the due process test is whether from the totality of circumstances "the defendant's will was overborne at the time he confessed". (See, e.g., *Haynes v Washington,* 373 US 503, 513; *Lynumn v Illinois,* 372 US 528, 534.)

No doubt some of the techniques used in the questioning of this defendant are not constitutionally offensive. But when the proceedings in the station house are considered as a whole, it shows an emotional battering of the defendant that in fact overcame his will. As observed above, much of the questioning took the form of exhortations to confess, employing different forms of psychological inducements, often expressed with great force and emotional intensity by experienced police officers acting in relays over a period of several hours. These exhortations were accompanied by a sustained effort to persuade the defendant that he would be helped significantly if he confessed, with the clear implication that otherwise he would be viewed as a bad person who had acted maliciously and treated accordingly.

In *Haynes v Washington (supra),* the United States Supreme Court held that the defendant's constitutional rights were violated by admission into evidence of a written confession after he was told that he would not be permitted to telephone his wife until he had confessed. The *Haynes* opinion discloses nothing approaching the coercive pressures here presented. By any standard, the cumulative impact of what occurred here on the defendant's will was more significant and far-reaching.

Accordingly, the judgment of the Supreme Court, Bronx County (D. SULLIVAN, J.), rendered January 10, 1977, convict-

ing the defendant on his plea of guilty, following denial of a motion to suppress, of murder in the second degree and sentencing him to 15 years to life, is reversed on the law, the plea of guilty is vacated, the motion to suppress is granted, and the case is remanded for further proceedings.

MURPHY, P. J., FEIN and CARRO, JJ., concur; KUPFERMAN, J., dissents and would affirm.

Judgment, Supreme Court, Bronx County, rendered on January 10, 1977, reversed on the law, the plea of guilty is vacated, the motion to suppress is granted, and the case is remanded for further proceedings.