927 P.2d 844

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Brian LUTON, Defendant–Appellee.**

**No. 18084.**

Supreme Court of Hawai'i.

Nov. 8, 1996.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, Honolulu, for plaintiff-appellant.

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

On May 10, 1993, Defendant–Appellee Brian Luton was charged with murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5(1),[1] and burglary in the first degree, in violation of HRS § 708–810(1)(c).[2]

On March 16, 1994, Luton filed a Motion in Limine to Determine the Voluntariness of Defendant's Statements. The trial court filed its findings of fact (FOF), conclusions of law (COL), and order regarding Luton's motion in limine on April 26, 1994. Based on its COL, the trial court ordered the suppression of several statements made by Luton to Honolulu Police Department (HPD) officers. Thereafter the prosecution timely appealed.[3]

The prosecution contends that the trial court erred in holding that, pursuant to *State v. Liulama,* 9 Haw.App. 447, 845 P.2d 1194 (1992), Luton had a sixth amendment right under the United States Constitution to assistance of counsel, which attached at the Judicial Determination of Probable Cause[4]

---

1. HRS § 707–701.5(1) (1993) states in pertinent part:

 **Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

2. HRS § 708–810 (1993), states in pertinent part:

 **Burglary in the first degree.** (1) A person commits the offense of burglary in the first degree if he intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

* * *
 (c) He recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

3. Superficially, the instant appeal is from a motion in limine; however, *functionally* it is an appeal from a motion to suppress. Thus, we deem it to be an appeal "[f]rom a pretrial order granting a motion for the suppression of evidence, including a confession or admission...." *See* HRS § 641–13(7).

4. Hawai'i Rules of Penal Procedure (HRPP) Rule 5, states in pertinent part:

 Rule 5. PROCEEDINGS BEFORE THE DISTRICT COURT

(JDPC), because the same is a constitutionally "critical stage" in a criminal proceeding and, therefore, Luton's voluntary waiver of his right against self incrimination was invalid. The prosecution also argues that the defendant voluntarily waived his fifth amendment rights to counsel and against self-incrimination. For the following reasons we agree and vacate the judgment of the circuit court.

## BACKGROUND

On April 26, 1993, shortly after one o'clock in the morning, HPD received a report of a stabbing at the Tahitian Lanai in Waikīkī. The victim's adult daughter told police at the scene that she had seen a black male with a ponytail run out of her mother's bedroom. The police immediately sent out an all points bulletin (APB) which provided a description of the suspect.

Within minutes, Luton, who matched the description in the APB, was spotted walking in the Fort DeRussy area. When an officer attempted to speak with him, Luton fled into the ocean. Several police officers tried to coax him from the water, yet Luton insisted he wanted to die and that he wanted them to shoot him. Eventually, several officers entered the water and pulled Luton from the ocean. Once ashore, Luton was arrested.

Shortly thereafter Police Officer Brenda Medeiros (Officer Medeiros) heard Luton say: "We've all got to make a living somehow, I needed the money, just kill me already." When Officer Medeiros asked Luton for his name, Luton responded, "I didn't do it, it was someone else." Officer Medeiros then questioned Luton about the stabbing. Luton claimed that a person named "Max"

was responsible for the crime. Thereafter, Luton was taken to Queen's Medical Center for treatment of hand lacerations, but he refused any medical care.[5]

Detective James Kinimaka (Detective Kinimaka) was assigned to investigate the case. He reviewed several police reports concerning the incident, and learned that: (1) two eye-witnesses had identified Luton as the man running out of the victim's bedroom shortly after the stabbing; and (2) after police apprehended Luton, they found several items on his person that had been taken from the victim's hotel room.

On April 27, Luton appeared before the district court for a JDPC. Prior to the JDPC proceeding, a public defender met with Luton, informed Luton that he was his lawyer, and advised him not to say anything to anyone, including the police. At the JDPC, the court determined there was probable cause for the arrest and Luton was returned to the police station.

Later that same day, Detective Kinimaka and Detective Stephen Dung (Detective Dung) questioned Luton, unaware that he had been represented by counsel at the JDPC hearing. Prior to the interrogation, the detectives advised Luton of his constitutional rights. He indicated that he understood his rights, and agreed to waive them and to make a videotaped statement. Luton thereafter admitted being in the victim's hotel room at the time of the stabbing, but insisted that a person named "Max" was responsible for the attack.

Following the interview, Detective Tracy Griffin (Detective Griffin) administered a polygraph examination after first apprising Luton of his *Miranda* rights. Once again, Luton waived his rights, including his right

(a) In General
* * *
(2) *Probable Cause Determination Upon Arrest Without a Warrant.* As soon as practicable, and not later than 48 hours after the warrantless arrest of a person held in custody, a district judge shall determine whether there was probable cause for the arrest. No judicial determination of probable cause shall be made unless there is before the judge, at the minimum, an affidavit of the arresting officer or other person making the arrest, setting forth the specific facts to find probable cause to believe that an offense has been committed and that the arrested person has committed it.

If probable cause is found as aforesaid, an appropriate order shall be filed with the court as soon as practicable. If probable cause is not found, or a proceeding to determine probable cause is not held within the time period provided by this subsection, the arrested person shall be ordered released and discharged from custody.

5. During his initial interview with Detectives James Kinimaka and Stephen Dung, Luton explained that his foot had been trapped in underwater rocks during his flight from police. He suffered the injuries while attempting to free himself.

to have an attorney present. Subsequently, Luton made several incriminating statements to Detective Griffin and informed her that he wished to make changes to the initial statement he had given to Detectives Kimimaka and Dung.[6]

The next day, after advising Luton again of his constitutional rights, Detectives Kinimaka and Dung questioned him regarding his statements to Detective Griffin.[7] Luton confessed to stabbing the victim, but asserted that the act had been unintentional. He then made a videotaped statement to that effect.

Luton was charged with murder in the second degree and burglary in the first degree. Prior to trial, he filed a motion to suppress evidence, arguing that the statements he made to police were not voluntary and were made in violation of his fifth and sixth amendment rights to counsel. The trial court agreed with Luton and suppressed several of the statements he made to Officer Medeiros and to Detectives Kinimaka, Dung, and Griffin.

The prosecution has not appealed the suppression of Luton's admissions to Officer Medeiros. At issue on appeal are several FOF and COL, all of which were relied upon by the trial court in its order suppressing the statements. FOF 15 provides:

> 15. The decision to initiate the process for a judicial determination of probable cause was initiated by the State.

COL 4 and 5 provide:

> 4. After the defendant was initially taken into custody, and after Detective Kinimaka had initially reviewed the reports of the other officers which indicated that two eye-witnesses had identified the defendant was a suspect in the stabbing and that at the time of his initial arrest the defendant was in possession of property belonging to the victim, the investigation had focused on the defendant. When the decision was made to seek a judicial determination of probable cause the police had already determined that they were not going to release the defendant. Therefore, the hearing on the judicial determination of probable cause, under the totality of the circumstances, was a critical stage in the adversarial process. In addition, at the proceeding to determine probable cause, the defendant had accepted and exercised his right to be represented by counsel. Once the defendant had exercised his fundamental right to counsel, the police were required to take affirmative steps to protect the defendant's right to counsel by at least contacting the defendant's attorney before commencing any custodial interrogation and to give the defendant an opportunity to meet with and to be properly advised by his counsel. Even though Detective Kinimaka was unaware that the defendant had been represented by an attorney, the State had initiated the critical judicial determination of probable cause and the defendant was represented by counsel at the probable cause hearing; therefore, having failed to protect the defendant's right to meet with counsel that had already been appointed for him,

---

6. Detective Griffin's report stated, in pertinent part:

> Mr. Luton stated that he was looking for money to pay for his polygraph exam. He thought the apartment was empty and when he entered the bedroom he realized that someone was asleep in the bed. He tried to be quiet as he searched the bedroom, but then he heard voices talking outside the window. The sleeping woman woke up and he felt he was going to get caught. He then heard a woman screaming in the doorway, so he panicked and felt himself punch the woman from the bed in the chest.... He stated he had a knife in his hand that he had brought into the apartment with him. He then felt himself pull the knife out of the woman's chest and ran out the door, past the screaming female and over the balcony.

7. The second interview commenced as follows:

> Q: [DETECTIVE KINIMAKA] Okay, Brian, prior to coming back to this office here, you met with Detective Griffin.
> A: [LUTON] Yes.
> Q: An[d] during your meeting with her, you informed her—you talked about certain facts of this case.
> A: Yes.
> Q: Okay, and while talking with her, there were—there was some information that was different than what you told us earlier this evening when we interviewed you here, is that right?
> A: Yes.

defendant's statements to Detective Kinimaka and Detective Dung on April 27, 1993 and April 28, 1993, and the defendant's statements to Detective Griffin on April 27, 1993 were obtained in violation of the defendant's right to counsel.

5. Although the defendant waived his right to counsel prior to providing Detectives Dung, Kinimaka and Griffin with his statements, and acknowledged that waiver both orally as well as on the HPD forms, under *State v. Liulama*, 9 Haw.App. 447, 845 P.2d 1194 (ICA 1992), defendant's waiver was invalid.

### DISCUSSION

A. *An Accused's Right to Counsel under the Sixth Amendment to the United States Constitution and Article I, Section 14 of the Hawai'i Constitution*

The trial court based its ruling in favor of Luton solely on its understanding of his *sixth* amendment rights:

[PROSECUTION]: My only concern is that if it goes up on the quote *Liulama*, an issue without a finding as to voluntariness, assume that he has not gone to a J.D.P.C., would this court hold that the statements made to Kinimaka, Dung and Griffin were then voluntary [sic] given into evidence?

THE COURT: Yes.

[PROSECUTION]: Thank you. And can that be included in the court's order?

THE COURT: Yes. And that includes the fact that the court—and it'll be included in the findings of fact that the court has reviewed the video tapes and the court is satisfied, based on reviewing the video tapes as well as the testimony in this case, that *the defendant voluntarily waived his right to counsel.*

(Emphasis added.)

An individual has a right to counsel under "the sixth amendment to the United States Constitution [8] and article I, section 14 of the [Hawai'i] State Constitution [9] [which] guarantees an accused the right to assistance of counsel for his or her defense." *State v. Liulama*, 9 Haw.App. 447, 453 n. 5, 845 P.2d 1194, 1199 n. 5 (1992). However, this right "attaches at critical stages of the criminal prosecution[,]" *State v. Masaniai*, 63 Haw. 354, 358, 628 P.2d 1018, 1022 (1981) (citing *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)), "only 'at or after the initiation of adversarial judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *Masaniai*, 63 Haw. at 359, 628 P.2d at 1022 (quoting *Kirby v. Illinois*,[10] 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)).

An adversarial judicial criminal proceeding does not commence upon the mere arrest of an accused. *Masaniai*, 63 Haw. at 360, 628 P.2d at 1023 (holding that the issuance and execution of an arrest warrant alone does not constitute the initiation of adversarial criminal proceedings). In *Ma-*

---

8. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const., amend. VI.

9. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed, which district shall have been previously ascertained by law, or of such other district to which the prosecution may be removed with the consent of the accused; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against the accused; to have compulsory process for obtaining witnesses in the accused's favor; and to have the assistance of counsel for the accused's defense. Juries, where the crime charged is serious, shall consist of twelve persons. The State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment.

Hawai'i Const., Art. I, § 14.

10. In *Kirby v. Illinois*, "[t]he Court held that there was no Sixth Amendment right to assistance of a counsel at a showup conducted after the accused had been arrested but before he had been indicted or formally charged." *Masaniai*, 63 Haw. at 359, 628 P.2d at 1022.

*saniai,* this court applied the reasoning enunciated by the United States Supreme Court in *Kirby v. Illinois, supra:*

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute and only then that the adverse positions of government and defendant have solidified.

*Masaniai,* 63 Haw. at 360, 628 P.2d at 1023. Moreover, "[t]he Court further established that it will not 'import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of formal prosecutorial proceedings.'" *Masaniai,* 63 Haw. at 360, 628 P.2d at 1023 (quoting *Kirby v. Illinois,* 406 U.S. at 690, 92 S.Ct. at 1882–83).

In the instant case, the trial court held that "the hearing on the judicial determination of probable cause, under the totality of the circumstances, was a critical stage in the adversarial process." In COL 4, the trial court reasoned that, because Luton had exercised his right to an attorney at the JDPC, subsequent questioning by the police in the absence of his lawyer was a violation of his sixth amendment rights. Therefore, it is appropriate at this juncture to determine whether a JDPC is a "critical stage" for sixth amendment purposes.

In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the United States Supreme Court addressed the issue whether Florida's probable cause determination hearing [11] was a "critical stage" in the prosecution that would require counsel. The Court held that

[b]ecause of its limited function and its nonadversary character, the probable cause determination is not a "critical stage" in the prosecution that would require appointed counsel. The Court has identified as "critical stages" those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel.

*Id.* at 122, 95 S.Ct. at 867 (citations omitted). The Court stated that a probable cause determination was not an adversarial proceeding; therefore, it need not "be accompanied by the full panoply of adversary safeguards—*counsel,* confrontation, cross-examination, and compulsory process for witnesses." *Id.* at 119, 95 S.Ct. at 866 (emphasis added). The *Gerstein* Court reasoned that:

> [A]dversary safeguards are not essential for the probable cause determination required by the Fourth Amendment. The sole issue is whether there is probable cause for detaining the arrested person pending further proceedings. This issue can be determined reliably without an adversary hearing. The standard is the same as that for arrest. The standard—probable cause to believe the suspect has committed a crime—traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof.

*Id.* at 120, 95 S.Ct. at 866 (footnote omitted).

The prosecution does not initiate charges against a defendant at a JDPC, a non-adversarial proceeding which serves only to determine if further incarceration is warranted.[12] The JDPC is a constitutional pro-

---

**11.** The Court described Florida's probable cause determination hearing:
> Upon arrest the accused would be taken before a magistrate for a "first appearance hearing." The magistrate would explain the charges, advise the accused of his rights, appoint counsel if he was indigent, and proceed with a probable cause determination ... If either [the prosecutor or defense] requested more time, the magistrate would set the date for a preliminary "hearing[.]"

*Gerstein,* 420 U.S. at 108, 95 S.Ct. at 860.

**12.** HRPP Rule 5(c)(2)(ii), states in pertinent part "[t]hat in order to establish probable cause the

State must offer sufficient evidence to 'lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion' that the defendant has committed the felony charged or an included felony[.]"

The purpose of a JDPC hearing is simply to determine "whether there was probable cause for [an accused's] arrest in light of *County of Riverside'v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991)." Order Dismissing Petitions and Governing Future Procedures (June 19, 1991). "If probable cause is not found ... the arrested person shall be ordered released

cedural safeguard required by the fourth amendment.[13] Adversarial proceedings, such as a formal felony prosecution,[14] preliminary hearing,[15] indictment,[16] information, or arraignment, usually commence after a JDPC, and it is only during these "critical stages" that the sixth amendment right to counsel is triggered. Consequently, we hold that a JDPC is not a "critical stage" in criminal proceedings such that a sixth amendment right to counsel attaches automatically.[17]

and discharged from custody." *See* HRPP Rule 5(a)(2).

**13.** In *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975), the United States Supreme Court held "that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest."

**14.** HRPP Rule 5(c)(2)(i).

**15.** HRPP Rule 5(c)(1) states in pertinent part:

(1) *Initial Appearance: Scheduling of Preliminary Hearing.* At the initial appearance the court shall ... furnish the defendant with a copy of the sworn complaint and any affidavits in support thereof together with a copy of the appropriate order of judicial determination of probable cause, if any, and inform the defendant of the right to a preliminary hearing.

**16.** The *Liulama* court cited with approval the following reasoning from *State v. Sanchez*, 129 N.J. 261, 609 A.2d 400 (1992):

The *Sanchez* court observed that once an indictment has been returned, the relationship between the state and the defendant becomes adversarial. The state has established that it has a *prima facie* case and is committed to prosecution. Interrogation of the accused at this point can only be for the purpose of buttressing the state's case.

*State v. Liulama*, 9 Haw.App. at 457, 845 P.2d at 1201 (1992). *See also Masaniai*, 63 Haw. at 360, 628 P.2d at 1023. The court further noted that:

Given the adversarial nature of their relationship, for the State's representatives to communicate adequately that information to an indicted defendant would be difficult, nigh impossible. *As a general rule, after an indictment and before arraignment, prosecutors or their representatives should not initiate a conversation with defendants without the consent of defense counsel.*

*Liulama*, 9 Haw.App. at 458, 845 P.2d at 1201 (emphasis in original).

**17.** A substantial number of other jurisdictions are in accord with our holding that a suspect's right to counsel under the sixth amendment does not attach at a JDPC hearing, or its equivalent.

In its erroneous determination that a JDPC was a "critical stage," the trial court relied on the reasoning in *Liulama*, *supra*. In *Liulama*, the defendant was arrested after an indictment was returned by the grand jury. Following the arrest, HPD officers told the defendant that "all he had to do was tell the truth" but did not inform him of the indictment against him. *Liulama*, 9 Haw. App. at 451, 845 P.2d at 1199. The defendant, Liulama, signed an HPD form 81[18] and

*Carr v. State*, 840 P.2d 1000 (Alaska App.1992) (holding that the right to counsel is not triggered by purely investigative police efforts; before a person may claim right, state must take some type of formal adversary action, changing person's status from that of suspect to that of accused in criminal prosecution); *Loveless v. State*, 592 P.2d 1206, *appeal after remand*, 634 P.2d 941 (Alaska App.1981) (holding that unlike privilege against self-incrimination, right to counsel provided by sixth amendment attaches only after formal charges have been filed); *People v. Vigoa*, 841 P.2d 311 (Colo.1992) (holding that the sixth amendment right to counsel attaches only at or after criminal prosecution has been commenced against accused whether by way of formal charge, preliminary hearing, indictment, information, or arraignment); *Heffner v. State*, 530 N.E.2d 297 (Ind.1988) (holding that the sixth amendment right to counsel attaches at or after time adversary proceedings have been initiated against accused by way of formal charge, indictment information or arraignment); *State v. Saylor*, 223 Neb. 694, 392 N.W.2d 789, *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1986) (holding that the sixth amendment right to counsel does not attach until after initiation of formal charges); *State v. Hamons*, 248 Kan. 51, 805 P.2d 6 (1991) (holding that the sixth amendment right to counsel arises when judicial proceedings have been initiated against suspect whether by way of formal charge, preliminary hearing, indictment, information, or arraignment); *State v. Waugh*, 238 Kan. 537, 712 P.2d 1243 (1986) (holding that where no complaint had been filed at time hearing was conducted before magistrate, no judicial proceedings had begun against defendant that would result in attachment of right to counsel); *State v. Newton*, 682 P.2d 295 (Utah 1984) (stating the sixth amendment right to counsel attaches when accused has been indicted or criminal proceedings have otherwise begun); *State v. Kalakosky*, 121 Wash.2d 525, 852 P.2d 1064 (1993) (stating the right to counsel under sixth amendment attaches only after initiation of formal charges).

**18.** In *Liulama*, the Intermediate Court of Appeals explained that

HPD form 81 [is] used by police officers to inform individuals being subjected to a custo-

was then questioned by a detective. Liulama later sought to have these statements suppressed based on the fact that, because he had been indicted, he had the right to an attorney under the sixth amendment and article I, section 14 of the Hawai'i Constitution. Liulama further alleged, and the court agreed, that HPD form 81 did not apprise him of his sixth amendment right to counsel. Based on these facts, the court suppressed the statements. *Id.* at 458, 845 P.2d at 1204.

*Liulama* and the instant decision are not incompatible insofar as both hold that a person's sixth amendment right to counsel attaches at a "critical stage" of the proceedings against the accused. In *Liulama*, however, the grand jury had indicted the defendant prior to his arrest. "Adversarial proceedings" had commenced against the accused and had reached a "critical stage" for sixth amendment purposes. In contrast, in the instant case, Luton had not been indicted when he made incriminating statements to HPD detectives. Instead, he had only been processed through the JDPC, which we have determined not to be a "critical stage".

Luton also urges the court to adopt the "New York" rule, which holds that once an attorney enters the proceeding, the police may not question the accused in the absence of counsel unless there is a waiver in the presence of the attorney. *People v. Skinner,* 52 N.Y.2d 24, 436 N.Y.S.2d 207, 417 N.E.2d 501 (1980); *People v. Hobson,* 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976). The *Hobson* court based its decisions on the New York Constitution and the case law of that state. *Hobson,* 384 N.Y.S.2d at 421, 348 N.E.2d at 896.

Both *Skinner* and *Hobson* are distinguishable from the case at bar. In *Skinner,* the defendant was questioned in a non-custodial setting. Prior to the interview, he had retained an attorney to represent him in the matter. On two previous occasions, his counsel had instructed the police not to question the defendant in his absence. *Skinner,* 52

N.Y.2d at 27, 436 N.Y.S.2d 207, 417 N.E.2d 501. The court held that Skinner had unequivocally invoked his right to counsel, and, thus, any waivers in the absence of counsel were involuntary. This is a fifth amendment analysis that is not applicable in the context of Luton's sixth amendment rights.

In *Hobson,* the court held that a waiver, obtained in the absence of a lawyer who had just represented the defendant in a lineup, was not valid. *Hobson,* 39 N.Y.2d at 481–82, 384 N.Y.S.2d 419, 348 N.E.2d 894. Luton was not placed in a lineup in the instant case. Furthermore, Hobson had *requested* counsel and, as discussed *infra*, Luton did not. *Id.* at 482, 384 N.Y.S.2d 419, 348 N.E.2d 894. Once again the facts are distinguishable, and Luton has based his sixth amendment "critical stage" arguments on fifth amendment analysis. In *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991), the Supreme Court identified the flaw in the appellant's argument: "Having described the nature and effects of both the Sixth Amendment right to counsel and the *Miranda–Edwards* 'Fifth Amendment' right to counsel, we come at last to the issue here: Petitioner seeks to prevail by combining the two of them."

■ Accordingly, we hold that, at the JDPC, Luton did not enjoy the constitutional protection of the sixth amendment's right to counsel. Therefore, Luton's subsequent statements to the police were not obtained in violation of the sixth amendment, and the trial court erroneously suppressed them.

B. *An Accused's Right to Counsel under the Fifth Amendment of the United States Constitution and Article I, Section 10 of the Hawai'i Constitution*

■ Because Luton was in custody and subject to several custodial interrogations, he enjoyed the protection of the fifth amendment of the United States Constitution and article I, section 10 of the Hawai'i Constitution. *State v. Kelekolio,* 74 Haw. 479, 501,

---

dial interrogation that they have a constitutional right to refuse to answer any questions put to them, that they are entitled to have an attorney present during the interrogation, and that an attorney will be appointed by the court

if they cannot afford one. The form also informs those individuals that whatever they say can be used against them in further proceedings.
*Liulama,* 9 Haw.App. at 452, 845 P.2d at 1198.

849 P.2d 58, 69 (1993). Once an accused is in custody, the police must precede all questioning of that individual with Miranda warnings, apprising the defendant of his constitutional rights. *State v. Hoey,* 77 Hawai'i 17, 33, 881 P.2d 504, 520 (1994). To determine if .the police afforded Luton the full range of constitutional protection to which he was entitled, this court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *State v. Villeza,* 72 Haw. 327, 331, 817 P.2d 1054, 1056, *reconsideration denied,* 72 Haw. 617, 841 P.2d 1074 (1991); *see also Hoey,* 77 Hawai'i at 32, 881 P.2d at 519. Such an examination requires a twofold analysis: (1) whether Luton was informed of his fifth amendment rights within the context of custodial interrogations; and, if so, (2) whether he invoked or waived these rights.

### 1. *Luton Was Informed of His Fifth Amendment Rights*

■ In *Hoey,* we set forth the "safeguards" to which an individual is entitled before being subjected to a custodial interrogation:

> *Miranda* imposed upon the prosecution the burden of demonstrating in any given case that these "procedural safeguards" had been employed and described them in relevant part as follows:
>
> > Prior to any [custodial] questioning, the [defendant] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a

right to the presence of an attorney, either retained or appointed.

*Hoey,* 77 Hawai'i at 33, 881 P.2d at 520 (citing *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612) (brackets in original).

■ The HPD detectives explained Luton's rights to him before each of the three interviews on April 27, 1993 and April 28, 1993. Luton was: (1) read his *Miranda* rights; (2) provided with HPD Form 81, "Warning Persons Being Interrogated of Their Constitutional Rights," which explained, in detail, his *Miranda* privileges; (3) required to initial each statement of HPD Form 81 as an officer explained them; (4) instructed that if he had any questions regarding the form, or his rights, that he could ask an officer; and, (5) asked if he understood his rights. At no time during these interviews did Luton advise the interviewing officers that he was represented by counsel. In fact, Luton specifically stated that he did not wish to have an attorney present. Moreover, Luton had been arrested for a prior felony and thus was aware of police interrogation procedures, as well as his right to counsel during custodial interrogations.[19] Accordingly, we decline to disturb the trial court's FOF 19, 20, 23 and 25,[20] which hold that Luton was fully apprised of his fifth amendment rights.

### 2. *Luton Did Not Invoke His Fifth Amendment Rights*

We have determined, *supra,* that Luton was properly informed of his fifth amendment rights. The next step in the analysis

---

**19.** In the past, this court has considered a defendant's past brushes with the law when evaluating a claim of an invalid confession. *See State v. Kekona,* 77 Hawai'i 403, 406, 886 P.2d 740, 743 (1994). *See also Lord v. Duckworth,* 29 F.3d 1216, 1222 (7th Cir.1994); *United States v. Meirovitz,* 918 F.2d 1376, 1379 (8th Cir.1990), *cert. denied,* 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991); *United States v. Glasgow,* 451 F.2d 557, 558 (9th Cir.1971).

**20.** FOF 19, 23, and 25 read as follows:

19. The defendant was taken from his cell and place into an interrogation room where he was advised of his constitutional rights, including his right to an attorney.

20. After the defendant waived his constitutional rights the Detectives obtained a videotaped statement from him. . . .
\* \* \*
23. Prior to the polygraph examination, Detective Griffin advised the defendant of his constitutional rights and after being so advised, the defendant waived his rights, including his right to an attorney.
\* \* \*
25. On April 28, 1993, at approximately 12:30 a.m., after being informed of and waiving his constitutional rights, the defendant gave a second videotaped statement to Detective Kinimaka and Detective Dung, in which he claimed to have unintentionally stabbed the victim after being surprised by the victim's daughter.

focuses on whether Luton invoked his fifth amendment rights during the custodial interviews of April 27, 1993,[21] and April 28, 1993.[22]

 An individual subject to custodial interrogation must expressly invoke his fifth amendment rights in order to shield subsequent statements made to officers of the State. *Hoey*, 77 Hawai'i at 33, 881 P.2d at 521. "The rule of [*Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)] applies only when the suspect 'ha[s] *expressed*' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda* .... It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991) (emphasis in original) (citations omitted). An accused invokes the constitutional protection against self-incrimination when he either remains silent or expresses "his desire to deal with police interrogators only through his counsel." *State v. Mailo*, 69 Haw. 51, 731 P.2d 1264 (1987). Thereafter, "he cannot be further questioned until counsel has been made available to him, unless the accused initiates further communication, exchanges or conversations with the police." *Id.* at 53, 731 P.2d at 1266; *see also State v. Ikaika*, 67 Haw. 563, 566, 698 P.2d 281, 284 (1985); *State v. Brezee*, 66 Haw. 162, 164, 657 P.2d 1044, 1046 (1983).

 At the suppression hearing, Luton admitted that, with respect to his second and third statements, the officers informed him of his rights, yet he did not ask to see an attorney.[23] It is clear, therefore, that he did not express, i.e., "invoke," his desire for counsel or his right to remain silent. He argues, however, that during his first interview with HPD detectives he did request an attorney, but was ignored. The trial court did not agree, found that he had waived his fifth amendment rights, and chose to believe the police officers' versions of the events and not Luton's:

> [PROSECUTION]: As to the other issues that were raised, is the court—is the court willing to or will the court make a determination as to the credibility of the

Q. She didn't threaten you in any way, shape, or form?
A. No, sir.
Q. Did you ever tell her because she was so nice to you that you wanted an attorney?
A. No, sir.
Q. Now when you go back [sic] to Kinimaka and Dung after talking to Griffin, did you tell them now the second time that you wanted an attorney?
A. No, I told them that the first time.
* * *
Q. You understood that you could stop the conversations at any time, correct?
A. I was told that, yes, sir.
Q. Did you understand that you could do that, sir?
A. Yes, sir.
Q. You knew that you could have an attorney, correct?
A. Yes, sir.
Q. You knew that the court would appoint one for you if you wanted it?
A. Yes, sir.
Q. But you don't [sic] tell Detective Griffin who's nice to you that you want an attorney, did you?
A. No, sir.

---

**21.** FOF 22, 23, and 24 detail the circumstances of Luton's incriminating statements made on April 27, 1993.

> 22. In the late evening hours of April 27, 1993, the defendant was removed from his cell and taken to a polygraph examination room where he under went a polygraph examination conducted by Detective Tracy Griffin.
>
> 23. Prior to the polygraph examination, Detective Griffin advised the defendant of his constitutional rights and after being so advised, the defendant waived his rights including his right to an attorney.
>
> 24. After the polygraph examination was finished, the defendant was informed that he had failed the examination; and upon learning that he had failed the examination, he provide Detective Griffin with a statement in which he admitted to stabbing the victim, but claimed that the stabbing was unintentional.

**22.** *See supra* note 20.

**23.** Q. [PROSECUTOR] In fact she [Griffin] went through your rights also, correct?
A. [LUTON] Yes, sir.
Q. And at no place on that form did you indicate you wanted to stop or get hold of an attorney?
A. No, sir.
Q. Even though you testified that she was really nice to you, correct?
A. Yes.

defendant versus that of Detectives Kinimaka and Griffin as to what transpired and his version, that he felt threatened throughout the way, given what took place?

THE COURT: Well, as—as to—well, those findings, the court's finding I think as to the—*I've already indicated that the credible testimony in my findings lie with the police officers and even, given their testimony, that the court's holding is based on their testimony.*

(Emphasis added.)

██ A trial court's findings of fact are reviewed under the "clearly erroneous" standard. *Dan v. State,* 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994). This includes assessing the credibility of witnesses. *State v. Kekona,* 77 Hawai'i 403, 406, 886 P.2d 740, 743 (1994). " 'A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed.' " *Dan,* 76 Hawai'i at 428, 879 P.2d at 533 (citation omitted). The record does not support a conclusion that Luton did, indeed, request an attorney during the first interview. Based on the evidence in the record, the trial court's findings on this issue, and Luton's own admissions that he failed to request an attorney at the last two interviews, we hold that Luton did not invoke his fifth amendment rights.

██ Luton argues that his representation by counsel at the JDPC was, in itself, an "invocation." In essence, he claims that attachment of his *fifth* amendment rights occurred at the JDPC, and rests this argument on a finding that a JDPC is a "critical stage" such that the right to counsel automatically attaches. He contends that any further questioning was precluded unless the police first notified his attorney. In *McNeil,* 501 U.S. at 178, 111 S.Ct. at 2209, the Supreme Court held that the assistance of counsel at a bail hearing did not rise to the level of an invocation of one's fifth amendment rights for all future purposes; desire for these constitutional protections must be communicated, which Luton failed to do. Moreover, a JDPC, as noted *supra,* is not a critical stage in the prosecutorial process. Thus, Luton's

argument is without merit. Because we have determined that Luton did not invoke his fifth amendment rights, we turn to the issue whether he validly waived them.

### 3. *Luton Waived His Fifth Amendment Rights*

██ On appeal, Luton claims that any waiver of his constitutional rights was ineffective. "After a defendant has been adequately apprised of his 'Miranda' rights, he 'may waive [effectuation of] these rights provided the waiver is made voluntarily, knowingly, and intelligently.' " *State v. Kaahanui,* 69 Haw. 473, 478, 747 P.2d 1276, 1279 (1987) (citation omitted). *See also State v. Pau'u,* 72 Haw. 505, 509, 824 P.2d 833, 835 (1992). To determine whether a valid waiver was given, this court must once again "examine the entire record and make an independent determination of the ultimate issue of voluntariness based on the totality of circumstances." *Kekona,* 77 Hawai'i at 406, 886 P.2d at 743. *See also Villeza,* 72 Haw. at 331, 817 P.2d at 1056. We now determine whether Luton's statements to the police detectives were made voluntarily, knowingly, and intelligently.

██ Luton testified that he not only understood his rights, but that he voluntarily initialed and signed three HPD Forms 81, waiving those rights. He admitted that no one threatened him, or held his hand and forced him to sign anything. Luton also knew he had the option to terminate the interviews at any time. The transcripts and videotape indicate that Luton engaged in intelligent conversation with police officials during each interview. At the suppression hearing, Luton admitted that Detectives Kinimaka, Dung and Griffin did not threaten or abuse him in any manner. Finally, Luton was not a neophyte to the criminal justice system: he was a convicted felon on parole who had been arrested just three short weeks prior to this incident. He had more than passing familiarity with police procedure. Based on the totality of the circumstances /of this case, we hold that Luton voluntarily, knowingly, and intelligently waived his fifth amendment privileges.

██ Luton also argues that his waivers were the fruit of prior police illegality be-

cause Officer Medeiros had elicited statements from him during his arrest, but before reading him his *Miranda* rights. These statements were suppressed by the trial court. On appeal, Luton contends that these admissions tainted his remaining confessions and, therefore, the waivers executed during the interviews with HPD detectives were ineffective. This argument is without merit.

In support of his position, Luton relies on *Pauʻu*, which stands for the proposition that a waiver of an individual's constitutional rights, even though voluntarily given, is invalid if induced by or obtained as a result of prior police illegality. In *Pauʻu*, the defendant was detained by police officers for an expired safety check on a vehicle. Pursuant to his arrest for motor vehicle violations, officers illegally searched a black bag in the defendant's car and discovered a number of stolen credit cards. The police used these items to persuade the defendant to make a confession. He was subsequently convicted of theft. On appeal, the defendant alleged that both his consent to search and his statements to police were invalid, because "he felt that refusal would have been futile because the police had already searched the bag without his consent." *Pauʻu*, 72 Haw. at 508, 824 P.2d at 835. In vacating Pauʻu's conviction, this court relied on the rule that:

> When the defendant makes a showing that waiver was predicated upon an illegal search, the government's burden in rebutting the invalidity of the waiver is to show that the waiver "has not been come at by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

*Id.* at 510, 824 P.2d at 836.

The facts of *Pauʻu* are distinguishable from those of this case. In *Pauʻu*, HPD personnel exploited illegally obtained evidence to elicit a confession from the defendant. In the instant case, however, there is no indication in the record that HPD detectives exploited Luton's illegally obtained statements to Officer Medeiros. Nor is there evidence to support a claim that officers used those statements to induce Luton into making a confession. The transcripts and the videotaped interview of Luton with Detectives Kinimaka and Dung are devoid of any mention of the admissions Luton made on the beach. Therefore, we do not agree with Luton that his "subsequent statements [on April 27 and 28, 1993] flowed from the fact that the initial incriminating statements [made to Officer Medeiros] had already been obtained. . . ." We hold that Luton's waiver was not predicated on the statements made to Officer Medeiros.

### 4. Luton's Statements to Police Were Not the Product of an Extrinsic Falsehood

Finally, Luton asserts that his confessions should be suppressed based on Detective Kinimaka's comment that it would be in Luton's "best interests" to give a statement on the evidence. Luton claims that this was an extrinsic falsehood, equivalent to a promise of more favorable treatment in the event of a confession and, therefore, coercive *per se* under *State v. Kelekolio*, 74 Haw. 479, 849 P.2d 58 (1993). Luton bases this argument on the examples listed in *Kelekolio*, which included "promises of more favorable treatment in the event of a confession." [24] *Kelekolio*, 74 Haw. at 512, 849 P.2d at 73 (citing *Commonwealth v. Meehan*, 377 Mass. 552, 387 N.E.2d 527, *cert. granted*, 444 U.S. 824, 100 S.Ct. 44, 62 L.Ed.2d 30 (1979), *cert. dismissed*, 445 U.S. 39, 100 S.Ct. 1092, 63 L.Ed.2d 185 (1980)).

At the suppression hearing, Detective Kinimaka testified as follows:

---

24. The *Kelekolio* court provided the following guidance:

[E]xamples of *extrinsic* falsehoods—of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt—would include (1) assurances of divine salvation upon confession, *see [State v.] Nelson*, [69 Haw. 461, 748 P.2d 365 (1987)] (2) promises of mental health treatment in exchange for a confession, *see [People v] Hogan*, [31 Cal.3d 815, 183 Cal.Rptr.

817, 647 P.2d 93 (1982)] (3) assurances of treatment in a "nice hospital" (in which the defendant could have his personal belongings and be visited by his girlfriend) in lieu of incarceration, in exchange for a confession, *see People v. Sunset Bay*, 76 A.D.2d 592, 430 N.Y.S.2d 601 (1980), *appeal dismissed*, 54 N.Y.2d 808, 443 N.Y.S.2d 649, 427 N.E.2d 946 (1981), (4) *promises of more favorable treatment in the event of a confession see [Commonwealth v.] Meehan*, 377 Mass. 552, 387 N.E.2d 527,

Q: [PROSECUTOR] Did you tell [Luton] that it would be in his best interests to give you a statement based on the evidence you had?

A: [KINIMAKA] I did.

Q: And why did you do that?

A: Because what I had gathered by the[n], it appeared that Brian Luton was responsible for this offense.

Q: Did you tell him or promise him that if he gave you a statement the system would go lighter or easier on him?

A: No, I did not.

Q: Did you promise him any benefits whatsoever from the system, that being the prosecutor's office, the police department or the courts, if he provided any statement whatsoever?

A: No, I did not.

Q: At any point during you conversations with him did you lie to him or misrepresent the evidence against him?

A: I do not believe so.

\* \* \*

Q: [DEFENSE COUNSEL] I'm sorry. I just need to know if that's correct, right? You said that you told him it would be best for him to give a statement based on what you knew about the case?

A: Correct.

Q: That's what you believed anyway?

A: Correct.

Q: Because you just told him it would be in his best interests to give a statement?

A: Correct.

Although Luton's account of the conversation differed, the trial court accepted the detective's version of the events as credible, and there is sufficient evidence in the record to support such a finding. Consequently, the issue is whether Detective Kinimaka's statement falls within the category of police conduct proscribed by *Kelekolio.*

In *Kelekolio,* a police detective claimed, falsely, that he had evidence that implicated the defendant in a sexual assault, and repeatedly enjoined him to tell the truth. *Kelekolio,* 74 Haw. at 501, 849 P.2d at 69. On appeal, the defendant challenged the use of these tactics. *Id.* This court held that the employment of such methods was not coercive because " '[m]ere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or promise does not render a subsequent confession involuntary.' " *Id.* at 505, 849 P.2d at 70 (citing *State v. Amaya–Ruiz,* 166 Ariz. 152, 155, 800 P.2d 1260, 1273 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991)).

In contrast, law enforcement personnel in *Meehan* made overt guarantees to the defendant regarding the benefits of a confession.[25] *Meehan,* 387 N.E.2d at 533. The *Meehan* court ruled that, when used in conjunction with other tactics, a promise of lenient treatment in the event of a confession was coercive. *Id.* at 534–35.

■ Both *Kelekolio* and *Meehan* condemned the use of coercive threats and

533–36, *cert. granted,* 444 U.S. 824, 100 S.Ct. 44, 62 L.Ed.2d 30 (1979), *and cert dismissed,* 445 U.S. 39, 100 S.Ct. 1092, 63 L.Ed.2d 185 (1980), (5) misrepresentations of legal principles, such as (a) suggesting that the defendant would have the burden of convincing a judge and jury at trial that he was "perfectly innocent" and had nothing to do with the offense, *see Young v. State,* 670 P.2d 591 (Okla.Crim. App.1983), (b) misrepresenting the consequences of a "habitual offender" conviction, *see State v. Setzer,* 20 Wash.App. 46, 579 P.2d 957, *petition for review denied,* 90 Wash.2d 1025 (1978), and (c) holding out that the defendant's confession cannot be used against him at trial *see Commonwealth v. Dustin,* 373 Mass. 612, 368 N.E.2d 1388 (1977), *cert. denied,* 435 U.S. 943, 98 S.Ct. 1523, 55 L.Ed.2d 540

(1978), and (6) misrepresentations by an interrogating police officer, who is a close friend of the defendant, that the defendant's failure to confess will get the officer into trouble with his superiors and jeopardize the well-being of the officer's pregnant wife and child, *see Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

*Kelekolio,* 74 Haw. at 512–13, 849 P.2d at 73–74 (some emphasis in original and some added).

25. Specifically, the police officers: (1) provided incorrect information about the strength of the Commonwealth's case; (2) gave assurance that the defense would benefit from a confession; (3) exploited the defendant's unstable condition, youth, and inexperience; and (4) failed to inform the defendant he could telephone his family or friends. *Meehan,* 387 N.E.2d at 533.

promises, express or implied, by the police as a means of extracting confessions. There were none in this case. Detective Kinimaka made no promises, assurances, or deals with Luton, false or otherwise; his remark was similar to that of the detective's in *Kelekolio,* an exhortation to tell the truth. Without more, the statement was not coercive such that it rendered Luton's subsequent admissions involuntary.[26] In other words, Detective Kinimaka's comment was "[not] of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt...." *Id.* at 511, 849 P.2d at 73.

 Moreover, Luton admitted that the detectives did not threaten or mistreat him. In fact, Detective Griffin was so pleasant that he just "opened up" to her. Luton, himself, requested another meeting with Detectives Kinimaka and Dung. The fact that Luton subsequently had second thoughts regarding his confessions does not render them inadmissible. The exclusionary rule, which prohibits the use of improperly waived fifth amendment rights, is "designed to assure the 'essentially voluntary and knowing nature' of a waiver, not its ultimate wisdom." *State v. Kaahanui,* 69 Haw. 473, 481–82, 747 P.2d 1276, 1281 (1987) (quoting *Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 859, 93 L.Ed.2d 954 (1987)).

### CONCLUSION

For the reasons stated above, we hold that Luton's confessions to Detectives Kinimaka,

Dung and Griffin during the three interviews conducted on April 27 and 28, 1993 were not obtained in violation of the fifth and sixth Amendments of the United States Constitution, or article I, sections 10 and 14 of the Hawai'i Constitution. Accordingly, we vacate the trial court's order suppressing Luton's statements to Detectives Kinimaka, Dung, and Griffin, and remand for trial.

---

**26.** This conclusion is consistent with a majority of other jurisdictions. *See, e.g., United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985) (telling defendant that the best thing he could do was cooperate was not coercive); *United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.1974), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974) (discussing reasons why defendant should cooperate was not coercive); *Miller v. Fenton,* 796 F.2d 598, 608 (3d Cir.1986), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986) (government may discuss benefits of cooperation without rendering confession involuntary); *United States v. Shears,* 762 F.2d 397, 401–02 (4th Cir.1985) (government agents may initiate conversations on cooperation); *United States v. Ornelas–Rodriguez,* 12 F.3d 1339, 1348 (5th Cir.1994), *cert. denied,* — U.S. —, 114 S.Ct. 2713, 129 L.Ed.2d 839 (1994), *and cert. denied,* — U.S. —, 115 S.Ct. 103, 130 L.Ed.2d

51 (1994) (officer's statement to defendant that there were advantages to cooperating, without more, did not coerce confession); *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978) (telling defendant that cooperation will be made known to the court is not coercive); *Lord v. Duckworth,* 29 F.3d 1216, 1222 (7th Cir.1994) (defendant's mistaken belief as to scope of police officer's statement regarding lenient treatment did not render confession involuntary); *Rachlin v. United States,* 723 F.2d 1373, 1377–78 (8th Cir.1983) (agents' statement that it was in the defendant's best interest to cooperate, without any promises or coercive tactics, did not render confession involuntary); *United States v. Davidson,* 768 F.2d 1266, 1271 (11th Cir.1985) (statement to defendant that cooperation would be passed on to judicial authorities was not coercive).