30 P.3d 238

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Jennifer EDWARDS, Defendant–Appellant.**

No. 22781.

Supreme Court of Hawai'i.

Aug. 22, 2001.

226

Deborah L. Kim, Deputy Public Defender, on the briefs, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

**Opinion of the Court by ACOBA, J.**

We hold that the police failed to make a reasonable effort to contact an attorney pursuant to Hawai'i Revised Statutes (HRS) § 803–9(2) (1993), as requested by Defendant–Appellant Jennifer Edwards (Defendant), when they did nothing more than call the attorney's listed telephone number twice on two different occasions, although informed that the number was not in service. However, we hold that the violation of HRS § 803–9(2) under the circumstances of this case did not warrant suppression of Defendant's subsequent statements. We hold, further, that Defendant voluntarily, knowingly, and intelligently waived her rights in giving the statements, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that her statements were voluntarily made. *See State v. Kelekolio*, 74 Haw. 479, 511, 849 P.2d 58, 73 (1993).

Accordingly, we affirm Defendant's August 10, 1999 judgment of conviction for manslaughter and the sentence imposed thereunder by the first circuit court (the court).[1]

**I.**

At 6:30 a.m. on December 17, 1997, Defendant was arrested by Honolulu Police Department (HPD) Detective Anderson Hee at the emergency room of Kaiser Moanalua Hospital for the murder of her twenty-month-old daughter, Cedra Edwards. HPD Detective Mark Wiese was also present at the scene.

At the time of the arrest, Defendant was eighteen years old. Defendant was not married. Mika Mika, Jr., Defendant's boyfriend who lived with Defendant and Cedra, was also arrested for Cedra's murder.

Hee and Wiese took Defendant from the hospital to the Kalihi Police Station for booking and then to the main police station. Hee ordered that Defendant be placed on suicide watch because Defendant was crying and visibly upset and because her daughter had died.

---

1. The Honorable John S.W. Lim presided over the pretrial and trial proceedings.

HPD Officer Gary Magislat testified that, at detectives' request, prisoners are sometimes restricted from using a telephone. When asked if, "[t]o [his] knowledge, [Defendant] was ... free to use the telephone if she so desired," Hee testified that "[s]he was free to." It is not evident from the record whether Defendant was ever informed of this.

At approximately 2:40 p.m. on December 17, 1997, some eight hours after Defendant was arrested, Hee and Wiese took Defendant from her cellblock for interrogation. They advised Defendant of her constitutional rights, using a standard "HPD Form 81," which advises an interviewee of his or her "*Miranda* rights." Of the following three questions, Defendant answered and initialed only the first question on the form as follows:

| | | | |
|---|---|---|---|
| Do you want an attorney now? | JE | Yes __ | No __ |
| Do you understand what I told you? | | Yes | No |
| Would you like to tell me what happened? | | Yes | No |

Hee asked Defendant if she wanted him to call a private attorney or a public defender. Defendant stated that Dawn Slaten had represented her in a matter concerning her children and she wanted to talk to Slaten. At that point, Hee and Wiese stopped the interrogation. When they asked Defendant if she knew Slaten's telephone number, she said, "No." Wiese told Defendant, "[W]ell, that's okay, I'll find it." Wiese testified that "[he] had seen [HRS § 803–9[2]]" in the course of doing his job. When asked whether he was "familiar with [the] statute as having some bearing on ... the amount of effort[ ] and [the] requirements imposed on police in advising people of their rights and so forth[,]" Wiese said, "[Y]es." Hee instructed Wiese to notify Slaten that Defendant had requested counsel.

Wiese escorted Defendant down to the cellblock where they met with an evidence specialist to have Defendant photographed. At that point, around 4:00 p.m., Wiese went back to his office and located Slaten's telephone number in the 1997 GTE Hawaiian Telephone Book, which was the most current at the time. Wiese found two addresses, both with the same telephone number.

Wiese reported that when he dialed the number, he learned that "the number was not in service."[3] Wiese dialed the same number again to make sure that he had not misdialed and received the same message.

Wiese did not advise Defendant that Slaten's phone number was not in service. The parties stipulated that the number listed in the telephone book for Slaten "was disconnected on July 1, 1997 by 10:00 a.m." and that "the new telephone number ... was connected that same day" and "[was] included in the 411 database [on] 7/3/97." Wiese did not call 411 or make any further effort at that time to locate Slaten's number. Hee told Wiese to keep trying, when Wiese informed him that he had not been able to reach Slaten.

Wiese admitted that he was familiar with the 411 directory assistance number and had used it to locate a telephone number. He explained that he did not call directory assistance after hearing the recorded message because "it's been my experience that when people change numbers ... they'll tell you it's been changed to another number." Wiese also related that if a suspect requested a public defender, he would go down a list of public defenders and keep calling until he found one and that there were a "couple" of times he had to make at least three or four telephone calls before he found an attorney.

After Wiese's first failed attempt to contact Slaten, Mika, the second suspect in the case, was retrieved from the cellblock by Hee and Wiese and was interviewed. After interrogating Mika and returning him to his cell, Wiese called the same number listed in the telephone book for Slaten at around 5:20 p.m.

2. *See infra* at 231–32 & n. 7, 30 P.3d at 245–46.

3. Wiese testified that he did not recall what the recorded message was, but "it was one of those 'Beep, Code Nine' or something like that, a lady domes [sic] on and says this phone is not in service at this time, something to that effect."

Hé got the same recorded message and dialed the same number one more time to confirm that he was not misdialing. Again, Wiese did not call the operator or directory assistance or make any other efforts to contact Slaten.

Wiese testified that, in his mind, he planned to go to the "Kamehameha Highway address" listed in the telephone book for Slaten on the morning of December 18 if Slaten's telephone number was still not working. Wiese again did not inform Defendant that he had received a recorded message. Wiese thought that Slaten would not be available until the next day because the normal workday had ended. Wiese denied that he deliberately failed to contact Slaten. When Wiese informed Hee that he could not contact Slaten, Hee again told Wiese to keep trying.

Wiese did not leave the office until 3:00 a.m. the next day because of his work on the case. Similarly, Hee did not finish work until 2:30 a.m. Before they left, neither Wiese nor Hee informed Defendant that Wiese had tried calling Slaten but could not reach her. The record does not indicate that Defendant received any information from Wiese or Hee regarding Wiese's attempts to contact Slaten between 2:40 p.m., when Defendant requested counsel, and 3:00 a.m., when Wiese left work.

Hee testified at the suppression hearing that, in his experience, if an attorney's telephone number was not listed in a telephone book, "[y]ou can call the operator, I guess, and try to find the number" and acknowledged "[o]f course," when asked if he had called the operator before.

Hee resumed work at 7:45 a.m. on December 18, 1998. Wiese also returned to work at around 7:45 a.m., without going to the business address listed for Slaten in the telephone book. When asked why he did not go to Slaten's address after he arrived at work, Wiese recounted that he "was going to go later on that morning when [he] figured she would be in." He also testified that when "[they] were doing other things in the morning," Hee informed him of Defendant's desire to talk to them.

HPD Officer Erin Flinn testified that, as she was making her routine check of the female side of the custody block around 8:00 a.m., Defendant told her that "she wanted to talk to the detectives already and she didn't want a lawyer. She just wanted to talk to the detectives already." Without questioning Defendant, Flinn reported the incident to Ulysses Balmilero, the booking officer. By 8:15 a.m., Hee heard from Balmilero that Defendant wanted to talk to him. Hee informed Wiese of this and they spoke to Flinn and Balmilero to confirm what Defendant had said.

At around 9:00 a.m., Hee removed Defendant from the cellblock to the Criminal Investigation Division.[4] Wiese related that, although Defendant appeared distraught when Hee and Wiese arrested her the previous day, Defendant no longer seemed so. Hee told her that Wiese "made numerous attempts to contact [Slaten] and there's no number listed that works for her." When Hee asked Defendant if she "[w]ould ... like to have a public defender here[,]" Defendant replied, "No." Using a second HPD Form 81, Hee advised Defendant of her rights and, at 9:11 a.m., Defendant waived those rights by answering and initialing the questions on the form as follows:

| | Yes | JE | No |
|---|---|---|---|
| Do you want an attorney now? | | JE | No |
| Do you understand what I told you? | JE | Yes | No |
| Would you like to tell me what happened? | JE | Yes | No |

The interrogation lasted for an hour and fifteen minutes and ended at 10:26 a.m. Hee testified that while Defendant broke down

---

4. The record does not indicate that Hee informed Defendant of Wiese's failed attempts to contact Slaten at that point.

and cried several times during the interrogation when talking about Cedra's death, she was fairly composed in answering questions. During the interrogation, Defendant stated that she had punched Cedra in her chest and stomach. Defendant explained that she did not take Cedra to the doctor because she was worried about having Cedra taken away. At one point towards the end of the interrogation, Defendant indicated that she did not talk to the police the previous day because she had to "think":

> Q. [Hee] So, long time ago, you caught [Mika] once punching her in her stomach. . . . He's a big guy, he's bigger than Detective Wiese and I. If we were to punch one kind—one small child like that, they going get really hurt. Okay? You know what I mean?
>
> A. [Defendant] That's why I didn't want to talk to you guys that day because I had to think. I thought that maybe because of what I—I was hitting her, that's what happened, that's what made her— (inaudible). But I was thinking about how big he is and he hits her and stuff.
>
> Q. Okay—

Magislat testified that at 1:00 p.m., when he was performing a routine cell block check, Defendant knocked on her cell door and told him that she wanted to speak with Hee. At 1:10 p.m., Magislat relayed Defendant's request to Hee. The record does not indicate what Hee did after 1:10 p.m.

At approximately 6:10 p.m., Defendant was taken to HPD Detective Kyle Luke for a polygraph examination. Prior to submitting to a polygraph examination, Defendant executed a "Polygraph Waiver/Information Form" at 6:17 p.m. and a third HPD Form 81 at 6:20 p.m. On the HPD Form 81, she initialed the responses indicating (1) that she did not want an attorney at that time, (2) that she understood what Luke had told her, and (3) that she would like to tell Luke what had happened. At 8:01 p.m., Hee and Wiese interrogated Defendant again, and Defendant executed a fourth HPD Form 81 in the same manner as the one executed for Luke. Hee and Wiese took another statement from Defendant.

II.

On December 29, 1997, Defendant was charged with the offense of murder in the second degree of Cedra by causing her death and/or failing to obtain medical treatment for her injuries, see HRS §§ 702–203(3) (1993), 706–656 (Supp.1997), and 707–701.5 (1993), and with offenses against children. See HRS §§ 706–660.2 (1993) and 706–662(5) (Supp. 1997).

On May 28, 1998, Defendant filed a motion to suppress her statements based on a violation of HRS § 803–9(2). The hearing on Defendant's motion to suppress was held on June 23, 1998, June 30, 1998, and July 1, 1998. Defendant contended that "the [police] violated [Defendant]'s right to counsel, sixth amendment right to counsel[,] and her fifth amendment right against self incrimination" because the police had failed, under HRS § 803–9, "to take reasonable efforts to secure counsel and contact the lawyer Defendant requested[.]" Slaten did not testify. Defendant did not testify.

Despite the court's observation that "[Wiese's] initial intentions seemed to be illogical in light of the 411 availability via a simple phone call," the court said that there was "no reason to doubt Detective Wiese's intention to somehow contact [Slaten]." The court then denied Defendant's motion to suppress and stated "that reasonable efforts up to the time of interruption by . . . [D]efendant's request were being made[, a]nd even if there was a technical violation, I don't even know if suppression is the proper remedy for a technical violation of [HRS § ] 803–9[.]" On July 17, 1998, the court filed findings of fact, conclusions of law, and an order. Denying Defendant's motion to suppress statements, the court entered the following pertinent findings:

> 7. Detective Wiese was instructed by Detective Hee to notify Dawn Slaten that the Defendant had requested her counsel.
>
> 8. Detective Wiese consulted a current telephone book and obtained the listed telephone number of Dawn Slaten. Detective Wiese called the listed number around 4:00 p.m. on December 17, 1997 and ob-

tained a recorded message indicating that the telephone number was not in service.

9. Detective Wiese again called the telephone number listed for Dawn Slaten later that same day at 5:20 p.m. and received the same recorded message that the telephone number was not in service.

10. Detective Wiese assumed that the telephone number was temporarily not in service as it was a business number and he assumed there would have been a new number referenced had it been permanently changed.

11. Detective Wiese planned to go to the business address listed in the telephone book the next day to attempt to locate Dawn Slaten.

12. Detective Wiese made no further attempts to contact Dawn Slaten at that time as the business day had ended and he was involved in the initial stages of an ongoing homicide investigation. Detective[s] Hee and Wiese continued their investigation until 3:00 a.m. on December 18, 1997 and resumed later that same morning around 7:45 a.m.

13. From the time Defendant requested Dawn Slaten, until the time Defendant indicated that she wanted to talk to Detectives Hee and Wiese without an attorney present, there were no more than three regular business hours available in which to locate Dawn Slaten through reasonable efforts.

. . . .

16. Detectives [Hee and Wiese] advised the Defendant of her constitutional rights which she indicated she understood and waived. The Defendant prepared [sic] an HPD 81 form (Defendant's Exhibit B). The Defendant confirmed that no police officer had reinitiated contact with her and that she had contacted Officer Flinn to inform her that she wanted to talk to the detectives without an attorney present.

17. Detective Hee informed the Defendant that numerous attempts to contact Dawn Slaten had been made and there was no number listed that works for her. Detective Hee asked the Defendant if she wanted a Public Defender and she replied, "[N]o."

18. During the interview the Defendant explained that the reason she did not talk to the detectives initially was because she wanted to get things straight in her mind that it was not her who caused her daughter's death.

19. Defendant was tearful throughout the first interview with Detectives Hee and Wiese, but there was no evidence that the Defendant was coerced, incoherent or incapable of voluntarily, knowingly and intelligently waiving her constitutional rights.

Based on these findings, the court entered, *inter alia,* the following conclusions of law:

2. *Detective Wiese made reasonable efforts to contact Dawn Slaten, pursuant to HRS Sec. 803-9(2), given that he had less than three regular business hours to do so and was then in the ·initial states of a homicide investigation in which he was primarily involved.*

3. Neither the efforts made to contact Dawn Slaten, nor any delay in contacting Dawn Slaten caused the Defendant to succumb to despair, or in any other manner operate to violate her right to counsel or make her subsequent statements involuntary. The Defendant initiated contact with the detectives voluntarily.

4. The Defendant was not deprived of sleep, nourishment or telephone access. The Defendant's statements were voluntarily made after she voluntarily, knowingly and intelligently waived her constitutional rights.

5. The fact that the Defendant was on suicide watch and had just lost her daughter, alone is insufficient to render her waiver of constitutional rights invalid or her statements involuntary, as a matter of law.

6. The Defendant was on suicide watch and had just lost her daughter, but she was not so emotionally distressed or upset so as to render her waiver of constitutional rights invalid or her statements involuntary.

7. Prior to any questioning by the police, the Defendant voluntarily, knowingly

and intelligently waived her constitutional rights.

(Emphasis added.)

On September 23, 1998, Plaintiff–Appellee State of Hawai'i (the prosecution) moved for a determination of the voluntariness of Defendant's oral and written out-of-court statements made to the police, among others. The prosecution listed, among Defendant's out-of-court statements, Defendant's first statement made to Hee and Wiese on the morning of December 18, 1997, the statement made to Luke, and the second statement made to Hee and Wiese on the evening of December 18, 1997. At a voluntariness hearing conducted on March 9, 1999, the court did not review those statements because they were "already determined voluntary and preceded by proper warning" and they had been "the subject of the motion to suppress which was denied[.]"

## III.

The jury trial was conducted from April 14, 1999 to May 5, 1999. All three of Defendant's statements were introduced at trial. Defendant and Mika gave conflicting testimony as to who had injured Cedra. The prosecution's and Defendant's witnesses also gave conflicting testimony as to how Defendant and Mika had treated Cedra prior to her death. The jury found Defendant guilty of the included offense of manslaughter.[5]

The sentencing court denied the prosecution's motion for an extended term of life imprisonment and sentenced Defendant to twenty years' incarceration with a mandatory minimum term of six years and eight months under HRS § 706–660.2. Defense counsel subsequently filed a motion for reconsideration of the sentence, requesting that the mandatory minimum term of six years and

eight months be stricken. The motion was granted.[6]

On August 27, 1999, Defendant appealed. In her appeal, Defendant raises three points of error: (1) that the police failed to make reasonable efforts to contact Slaten, as required under HRS § 803–9(2) and, thus, that Defendant's subsequent statements should be suppressed; (2) that the police misrepresented Defendant's right to counsel and that the misrepresentation made the *Miranda* warnings defective; and (3) that Defendant's statements were not voluntary.

## IV.

Defendant maintains that the police violated HRS § 803–9(2) and that the violation warranted suppression of her subsequent statements. In this regard, she challenges the court's finding of fact No. 13 and conclusion of law No. 2. *See supra* at 230, 30 P.3d at 244.

■■■■■ "We review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right' or 'wrong.'" *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (internal quotation marks and citations omitted). In doing so, we adhere to the precepts that

factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard.

---

5. At the sentencing hearing, Defendant's counsel stated that post-verdict discussions with jurors revealed that they had harbored reasonable doubt as to who had actually inflicted the injuries upon Cedra and their verdict represented the conclusion that Defendant was guilty of "reckless" manslaughter by omission for having failed to obtain medical care for Cedra. The prosecution did not disagree.

6. The motion was granted because the court found that the jury had not made a determination of Cedra's age, *see generally State v. Tafoya*, 91 Hawai'i 261, 982 P.2d 890 (1999), and because "[t]o invoke another jury to decide this issue of whether or not age has been met would be … an extraordinary consumption of expense for the State and would not address the issue any more clearly than the Court was able to address under the circumstances of the case."

*State v. Eleneki,* 92 Hawai'i 562, 564, 993 P.2d 1191, 1193 (2000) (internal quotations marks and citations omitted). "'[T]he proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his [or her] own ... rights were violated....'" *State v. Augafa,* 92 Hawai'i 454, 992 P.2d 723, 733 (App.1999) (quoting *State v. Balberdi,* 90 Hawai'i 16, 21, 975 P.2d 773, 778 (App.1999)). "The proponent of the motion to suppress must satisfy this burden of proof by a preponderance of the evidence[.]" *State v. Wilson,* 92 Hawai'i 45, 987 P.2d 268, 271 (1999) (internal quotation marks and citation omitted).

HRS § 803-9(2), entitled "Examination after arrest; rights of arrested person," provides that

[i]t shall be unlawful in any case of arrest for examination:

. . . .

(2) To unreasonably refuse or fail to make a reasonable effort, where the arrested person so requests and prepays the cost of the message, to send a telephone, cable, or wireless message through a police officer or another than the arrested person to the counsel or member of the arrested person's family[.] [7]

---

7. The other parts of HRS § 803-9 (1993) provide that it is also unlawful:

(1) To deny to the person so arrested the right of seeing, at reasonable intervals and for a reasonable time at the place of the person's detention, counsel or a member of the arrested person's family;

. . . .

(3) To deny to counsel (whether retained by the arrested person or a member of the arrested person's family) or to a member of the arrested person's family the right to see or otherwise communicate with the arrested person at the place of the arrested person's detention (A) at any time for a reasonable period for the first time after the arrest, and (B) thereafter at reasonable intervals and for a reasonable time;

(4) *In case the person arrested has requested that the person see an attorney* or member of the person's family, *to examine the person before the person has had a fair opportunity to see and consult with the attorney* or member of the person's family;

(5) To fail within forty-eight hours of the arrest of a person on suspicion of having commit-

---

In conjunction with HRS § 803-9(2), HRS § 803-10 (1993) states that "[a]ny person violating or failing to comply with section 803-9 shall be fined not more than $500 or imprisoned not more than one year, or both."

Defendant contends that the police did not satisfy the "reasonable effort" requirement in HRS § 803-9(2) because Wiese did nothing after he determined that the telephone number listed for Slaten was out of service. According to Defendant, a "reasonable effort" would include, at minimum, calling 411 for directory assistance, particularly in light of Wiese's testimony that he was familiar with 411 directory assistance and that he had used such assistance. She observes that Hee himself testified that, based on his experience, he would call for directory assistance if an attorney was not listed in the telephone book and had done that before. Defendant also points out that Wiese testified that if a public defender was requested, he would keep calling until he found one and that there were a "couple" of times he had to make at least three or four telephone calls before he found an attorney available. The prosecution, on the other hand, argues that Wiese made a reasonable effort to reach Slaten based on the facts found by the court and Wiese's testimony that he had planned to drive by the place listed in the telephone book for Slaten's office.[8]

---

ted a crime either to release or to charge the arrested person with a crime and take the arrested person before a qualified magistrate for examination.

(Emphases added.)

8. The prosecution also asks this court to take judicial notice that, "as stated in the telephone directory, frequent use of directory assistance can subject a subscriber to additional charge[s]." We are not mandated to take the judicial notice requested because the prosecution did not "suppl[y us] with the necessary information" required for mandatory judicial notice under Hawai'i Rules of Evidence (HRE) Rule 201(d).

We will not take juridical notice here because the additional charge for frequent use of directory assistance is not relevant to this appeal. Commentary to HRE Rule 201-2 (1980) (stating that "[a]djudicative facts are those relevant to the issues before the court (*see* Rule 401 *infra*) and which serve to 'explain who did what when, where, how, and with what motive and intent,' McCormick § 328"). The prosecution does not argue that the police should not be required to

V.

A.

■ "In addition to examining the language in a statute, the courts, when interpreting statutes, may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool." *State v. Putnam*, 93 Hawai'i 362, 367, 3 P.3d 1239, 1244 (2000) (internal quotation marks and citations omitted).

HRS § 803–9 was originally enacted as part of the 1869 Penal Code of the Kingdom of Hawai'i.[9] In 1915, the legislature amended the statute to provide an arrested person with the right to see counsel.[10] The statute was amended in 1927 to include an arrested person's right to see a member of his or her family and to add a new section creating a penalty for violation of the statute.[11] 1927 Haw. Sess. L. Act 261, at 304–05.

The legislature amended the statute in 1941 "to grant to a person arrested for examination the right not only of seeing but otherwise communicating with counsel or a member of his [or her] family." 1941 Haw. Sess. L. Act 168, at 232–233, Stand. Comm. Rep. No. 324, in 1941 House Journal, at 1249. By this amendment, subsections (2), (3), and (4)

were added.[12] 1941 Haw. Sess. L. Act 168, at 232–33. Subsection (2) is the present HRS § 803–9(2). The purposes of the amendment included "safeguard[ing], as nearly as may be, the right of persons arrested and detained merely for examination, a process which has, in the past, been grossly abused[,]" Stand. Comm. Rep. No. 440, in 1941 Senate Journal, at 1086, and "clarif[ying]" "the rights of the person arrested for examination and of his [or her] family and counsel." Stand. Comm. Rep. No. 324, in 1941 House Journal, at 1249.

B.

HRS § 803–9(2) is consistent with the recommendation set forth in Standard 4–2.1, entitled "Communication," of the American Bar Association Project on Minimum Standards for Criminal Justice (2nd ed. 1986) [hereinafter "ABA Project"]. Standard 4–2.1 provides that "[e]very jurisdiction should guarantee by statute or rule of court the right of an accused person to prompt and effective communication with a lawyer and should require that reasonable access to a telephone or other facilities be provided for that purpose." The Commentary to the standard recognizes that, as in our state,

---

call directory assistance because of the cost. Neither Defendant nor the prosecution utilized the additional charge matter to support such arguments.

9. The section provided that "[i]n all cases of arrest for examination, the person making the same must conduct the party arrested before the court or magistrate empowered to take such examination, within forty-eight hours after his arrest, except in cases where a longer delay is absolutely necessary to meet the ends of justice." Penal Code of the Kingdom of Hawai'i ch. 49, § 9 (1869).

10. The amended statute provided as follows:

Section 3730. Examination after arrest. In all cases of arrest for examination, the person so arrested shall not be denied the right of seeing counsel at any time, and the person making the arrest shall conduct the party arrested before the court or magistrate empowered to take such examination within forty-eight hours after his arrest, except in cases where a longer delay is absolutely necessary to meet the ends of justice.

1915 Haw. Sess. L. Act 25, at 27. The legislature added the phrase "the person so arrested shall

not be denied the right of seeing counsel at any time" because it "seem[ed] a right which should not be denied to any man [or woman]." Stand. Comm. Rep. No. 69, in 1915 Senate Journal, at 257.

11. The purposes of the amendment were "to safeguard the citizens from abuses which have become more and more prevalent in the Police Department," Stand. Comm. Rep. No. 11, in 1927 House Journal, at 140–41, "to correct abuses by the police authorities in connection with arrests made without warrant and without the filing of formal charges against the persons arrested," and "to safeguard persons arrested against illegal detention." Stand. Comm. Rep. No. 377, in 1927 Senate Journal, at 1004. In 1935, Section 3975 of the Revised Laws of Hawai'i 1925 was renumbered as Section 5408 of the Revised Laws of Hawai'i 1935. *See* 1935 Sess. L., at 232.

12. *See supra* at 232 & n. 7, 30 P.3d at 246. The amended language of section 5408 is almost identical to HRS § 803–9 except for syntactical changes and the phrase in subsection (5), "take the arrested person before a qualified magistrate for examination," which was added in 1953.

"[m]ost jurisdictions long have provided by statute for the right of a person in custody to communicate with an attorney, either by a message carried by a peace officer or by a telephone call." ABA Project at 23. According to the Commentary, if the right to communicate with an attorney "is to be meaningful, it must be interpreted to permit *prompt* completion of the communication." *Id.* (emphasis added).

The Commentary to Standard 4–2.1 states that Standard 4–2.1 is consistent with Standard 5–7.1. *Id.* at 24. Standard 5–7.1, entitled "Explaining the availability of a lawyer," provides in pertinent part that

[a] person taken into custody or otherwise deprived of liberty should immediately be warned of the right to assistance from a lawyer. This warning should be followed at the earliest opportunity by the formal offer of counsel, preferably by a lawyer, but if that is not feasible, by a judge or magistrate. The offer should be made in words easily understood, and it should be stated expressly that one who is unable to pay for adequate representation is entitled to have it provided without cost. At the earliest opportunity a person in custody should be effectively placed in communication with a lawyer. There should be provided for this purpose access to a telephone, the telephone number of the defender or assigned-counsel program, and any other means necessary to establish communication with a lawyer.

*Id.* at 69. The Commentary to Standard 5–7.1 emphasizes that the purpose served by the right to communicate with a lawyer is broader in scope than that protected by the *Miranda* warning:

The offer of counsel to which this standard is addressed should not be confused with the "warning" required pursuant to *Mi-*

*randa v. Arizona* to render admissible in evidence statements made by the accused while in custody. *Necessarily, the circumstances and terms of such a warning cannot fulfill all the requirements for an offer of counsel, and the fact that a warning valid within the meaning of Miranda has been made should not in itself be considered as fulfilling the requirement of a formal offer.*

*Id.* at 71 (footnote omitted) (emphasis added).

■ Thus, the fact that Defendant was advised in the *Miranda* warning of her right to have an attorney present during interrogation would not obviate the application of HRS § 803–9(2). *See State v. Kirkpatrick*, 89 Wash.App. 407, 948 P.2d 882, 886 (1997), *review denied,* 135 Wash.2d 1012, 960 P.2d 938 (1998) (comparing a court rule requiring access to an attorney at the earliest opportunity with the *Miranda* warning). Consequently, the fact that a statement was properly obtained by virtue of prior *Miranda* warnings does not *ipso facto* cure a HRS § 803–9(2) violation. Hence, the police can comply with *Miranda* requirements but still violate HRS § 803–9(2).

## VI.

■ We cannot conclude that the police made a "reasonable effort" under the circumstances here.

The failure of the police to contact Slaten must be viewed in context. Defendant had been arrested at 6:30 a.m. on December 17, 1997 at the hospital emergency room, booked, and placed on suicide watch. It was not until 2:40 p.m., some eight hours later, that the detectives sought a statement from her and, in that process, notified her of her right to have an attorney present.[13] When

---

**13.** The statutes and rules of some jurisdictions require that contact with counsel be immediately offered after detention. *See e.g.,* Cal Penal Code § 851.5 (1985) (providing in pertinent part that (1) an arrested person has the right to make at least three complete calls *within three hours after arrest* except where physically impossible and is entitled to three local calls at no expense; that (2) any police facility or place where an arrestee is detained must have a sign stating the arrestee's right to free telephone calls within the local dialing area, or at his own expense if outside the local area, to an attorney or a public defender, a bail bondsman, and a relative or other person; and that (3) these telephone calls must be given immediately upon request, or as soon as practicable) (emphasis added); Mass. Gen. L. Ch. 276 § 33 (1994) (providing that "[t]he police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to ...

Defendant invoked her right to counsel, stating that she wanted to talk to an attorney, Wiese told Defendant that he would find Slaten's telephone number. Thus, the police undertook the obligation of contacting Defendant's attorney for her.[14] In this context, the court concluded in conclusion of law No. 2 that, as a matter of law, HRS § 803–9 was satisfied, *"given that* [Wiese] had less than three business hours to [contact Slaten] and was then in the initial stages of [the] investigation[.]" (Emphasis added.) We hold that the court was wrong.

The court's findings of fact[15] and conclusion of law that, "given that he had less than three regular business hours," Wiese had expended reasonable efforts "to contact Slaten" is not a circumstance countenanced under HRS § 803–9(2). HRS § 803–9 requires reasonable effort and does not limit the effort required to contact an attorney to "regular business hours." Even assuming an artificial three-hour time limitation, a call to directory assistance or notification to Defendant as to the inability to reach counsel could have been accomplished well within that time.[16]

engage the services of an attorney" and that "[a]ny such person shall be informed forthwith upon his [or her] arrival at such station or place of detention, of his [or her] right to so use the telephone, and such use shall be permitted *within one hour* thereafter") (emphasis added); Rule 3.1(c)(2) of the Superior Court Criminal Rules of Washington [Wa.Super.Ct.Cr.R.] (providing that "[a]t the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer") (emphasis added).

HRS § 803–9 does not contain similar language. However, the length of time a defendant is held before being allowed contact with an attorney may be a factor in applying the reasonableness standard of HRS § 803–9. That issue is not raised by Defendant in this case.

14. We do not consider the "prepay[ment of] the cost of the message" a viable consideration in construing HRS § 803–9(2), and none of the parties suggests that it is.

15. The court's finding of fact No. 13 that "there were no more than three regular business hours available in which to locate [Slaten] through reasonable efforts" actually is an application of HRS § 803–9(2) to the facts and is more appropriately styled a conclusion of law; indeed, it is couched in almost the same language as conclusion of law No. 2. While it is not clearly erroneous that there may have been "three regular business hours" left in the day, HRS § 803–9(2) does not limit reasonable efforts to "regular business hours" and so the court's unstated assumption that reasonable efforts could only be expended within those hours was clearly erroneous and wrong. *See People v. Cole,* 178 Misc.2d 166, 681 N.Y.S.2d 447, 449 (N.Y.Just.Ct.1998) (ruling that "[i]f the contact is attempted well outside of normal business hours, efforts to reach the lawyer only at the office when the home phone number is readily available are not reasonable and therefore are insufficient" because "[a] rea-

sonable effort in such circumstances requires the officer to locate the lawyer's home phone number if it is listed in either the yellow or the white pages of the phone book" and that "[a]nything less deprives defendant of his right to access to counsel").

16. *See State v. Larrett,* 127 Or.App. 139, 871 P.2d 1016, 1017, *review denied,* 319 Or. 149, 877 P.2d 86 (1994) (holding that a defendant had a reasonable opportunity to reach her attorney where the police officer (1) gave the defendant two telephone directories, (2) asked the defendant if she wanted to call information when she could not find the number, but she said "No," (3) allowed her to call her grandmother to get the number, (4) wrote down the attorney's number for her when she recited it, and (5) offered additional time to contact a different attorney because the defendant reached his answering machine and left a message, but she refused); *State v. Greenough,* 132 Or.App. 122, 887 P.2d 806, 807–08 (1994) (holding that a police officer made reasonable efforts to contact a lawyer-friend of the defendant where the arresting officer left the interview room to use a telephone capable of making long-distance calls, obtained the lawyer's number from directory assistance, placed the call, reached a recording that stated that the number had been changed, then called the forwarding number, reached an answering machine, and left a message requesting a return call and informing the lawyer of the defendant's need for assistance, attempted to obtain a telephone listing for the lawyer's home, and reported to the defendant that he had been unsuccessful in contacting the lawyer-friend, and the defendant made no further attempt to contact another lawyer after indicating that he still wanted to talk to a lawyer and would not answer any further questions until he did); *City of Bellevue v. Ohlson,* 60 Wash.App. 485, 803 P.2d 1346, 1347–48 (1991) (holding that police made a reasonable effort to contact an attorney for the accused under Rule 3.1(c)(2) of the Wa.Super.Ct.Cr.R. where a police officer (1) used a telephone book to locate the phone number of the defendant's attorney, (2) made six attempts to reach the attorney, but was unable to do so because the line was continuous-

Wiese made four telephone calls, all to the same telephone number. On each call he was informed that "the number was not in service." Assuming the second call was necessary to confirm the response received on the first call, there was no rational basis for making the third and fourth calls to the same number and no imaginable basis after the fourth call for failing to call for operator or directory assistance or for consulting with Defendant as to any other attorney Defendant may have wished to contact.[17] Obviously, calling 411 or the operator would have taken no longer than the time Wiese took to place one of his four calls. Wiese testified he was familiar with directory assistance and had used it. Inexplicably, he failed to do it in this case. As the court said, his action "seem[ed] illogical in light of the 411 availability" and his familiarity with directory assistance.

Hee, who apparently led the investigation, testified that, based on his experience, he would have called the operator to locate an attorney's phone number not listed in the phone book and had himself done so in the past.

Wiese claimed that he did not make further efforts on December 17 to contact Slaten because he was going to stop at Slaten's business address on the morning of December 18.[18] He never did so.

■ Nor, contrary to the court's conclusion of law No. 2, does anything in the record indicate that Wiese's involvement "in the initial stages of [the] investigation" impacted

his ability to contact Slaten. Such involvement could not dispense with Wiese's legal duty, under pain of criminal sanction, to comply with HRS § 803–9(2). *See People v. Cole*, 178 Misc.2d 166, 681 N.Y.S.2d 447, 449 (N.Y.Just.Ct.1998) (stating that it would not " 'interfere unduly with the matter at hand' " to require a police officer to locate an attorney's home phone number when the contact is attempted outside of normal business hours, because checking a phone book takes minutes at most) (quoting *People v. Gursey*, 22 N.Y.2d 224, 292 N.Y.S.2d 416, 418, 239 N.E.2d 351 (1968)). While there was testimony that a phone was available, it is plain from the record that neither Wiese nor Hee made a phone available to Defendant since they took on the obligation of contacting Slaten and had so informed her.[19] *See Cole*, 681 N.Y.S.2d at 449 (holding that, "[w]here the defendant is in custody and is reliant on a law enforcement officer to contact the attorney, the officer must make a reasonable attempt to reach defendant's lawyer" because "[t]he right to consult with counsel cannot be realized if counsel cannot be contacted"). As set forth above, no reasonable effort was expended to contact Defendant's lawyer.

Wiese's placement of the third and fourth calls to the same telephone number after being informed in the first and second calls that the number was no longer in service, his disregard of the availability of directory or operator assistance in obtaining a current telephone number for Slaten, the detectives' neglect in ascertaining on December 17 Defendant's wishes with respect to representa-

---

ly busy for at least twenty minutes, (3) called three different public defenders, but was unable to contact any of them, and (4) offered the defendant an opportunity to contact another attorney, but the defendant stated that he did not know any and consented to take the breath test without the advice of counsel).

17. Of course, the detectives could simply have made a telephone available to Defendant to accomplish this as some statutes and rules provide. *See* Cal.Penal Code § 851.5; Mass. Gen. L. Ch. 276 § 33A; Minn.Stat. § 481.10, Rule 3.1(c)(2) of the Wa.Super.Ct.Cr.R.

18. As demonstrated by the following exchange, it is apparent that going to Slaten's address required more time and effort than using 411 directory assistance.

Q. [DEFENSE COUNSEL] ... Which would you say takes more effort—going down to see Dawn Slaten in Pearl City, or dialing 1411?

[PROSECUTOR] Your Honor, I object as argumentative.

[DEFENSE COUNSEL] Well, I don't believe so, because if we're talking about a reasonable standard, it's part of it, it goes to the amount of effort it would take to take alternative—

COURT: Well, I'm not an idiot. I'll sustain it.

19. The court's conclusion of law No. 4 that, *inter alia*, Defendant was not deprived of telephone access is, at best, gratuitous, because Defendant was confined to the cellblock, there was no evidence she was informed a telephone was made available to her, and Wiese informed Defendant he would contact her attorney.

tion in light of their failed attempts, and Wiese's failure to even follow through on his purported plan to stop at Slaten's address on the morning of December 18, all belie any reasonable attempt to adhere to the statutory mandate of HRS § 803–9(2). Objectively viewed, the efforts here lacked any real and substantive compliance with the statute.

For the reasons stated above, we believe the detectives did not make efforts reasonable enough "to safeguard, as nearly as may be, the right of persons arrested." Stand. Comm. Rep. No. 377, in 1927 Senate Journal, at 1004. The court was wrong in concluding that the steps taken by the police amounted to a reasonable effort to. send a telephone message to Slaten under HRS § 803–9(2). Accordingly, we vacate the court's conclusion of law No. 2 that the police "made reasonable efforts to contact Dawn Slaten, pursuant to HRS Sec. 803–9(2)[.]" The question remaining, however, is whether the violation of the statute requires suppression of the evidence.

## VII.

### A.

Citing *State v. Pattioay*, 78 Hawai'i 455, 896 P.2d 911 (1995), Defendant contends that a violation of HRS § 803–9(2) requires that her statements be suppressed. The prosecution argues that it does not, because, in *State v. Kaeka*, 3 Haw.App. 444, 449–50, 653 P.2d 96, 100–01 (1982), the Intermediate Court of Appeals (the ICA) rejected suppression of evidence as a remedy for a related HRS § 803–9(4) violation.

### B.

In *Kaeka*, the defendant told police that she wanted to talk to her father before speaking to the police. She was interrogated and gave an inculpatory statement before speaking to her father. The trial court ruled her statement must be suppressed for violation of HRS § 803–9(4). *See supra* note 7. On the prosecution's appeal from the suppression order, the ICA held that the defendant had free access to a telephone during her detention and that there was no evidence that she was denied a "fair opportunity" to see or consult with her father. After concluding that there was no violation of HRS § 803–9(4), the ICA, in dictum, stated that, assuming a violation had occurred, suppression would not be warranted unless the statutory violation was of constitutional dimension:

[E]ven assuming a violation of HRS § 803–9(4), such statutory violation (right to consult with a family member) as contrasted to a constitutional violation (right to consult with an attorney) would not result in the application of the exclusionary rule. Section 803–10, HRS (1976),[20] imposes a penal sanction of up to one year of imprisonment for violation of HRS § 803–9. Neither it nor any other statute requires the exclusion of voluntary statements made by an arrested person to the police in cases where the police have violated the arrested person's rights under HRS § 803–9.

The limited scope of the exclusionary rule was defined by the Hawaii Supreme Court in *Rossell v. City and County*, 59 Haw. 173, 579 P.2d 663 (1978). "Generally, where evidence has been obtained in violation of a statute, that evidence is not inadmissible per se in a criminal proceeding unless the statutory violation has constitutional dimensions." *Id.* ... at 187, 579 P.2d [at 672] (citations omitted).[21]

20. The provisions of HRS § 803–10 have not changed since 1927.

21. In *Rossell v. City and County of Honolulu*, 59 Haw. 173, 579 P.2d 663 (1978), the city, police officers, and doctor (the defendants) appealed from the judgment in favor of a motorist for damages stemming from the defendants' alleged forcible removal of the motorist's blood sample in violation of the implied consent statute, HRS chapter 286, when the police arrested the motorist for driving while under the influence of alcohol (DUI).

The defendants, *inter alia*, contended that the trial court erred in submitting to the jury the propriety of the removal of plaintiff's blood sample on the ground that the district court judge in the criminal proceeding for the plaintiff's DUI offense refused to suppress the result of the blood test and, thus, that the issue of the legality of taking the blood sample had already been litigated. *See id.* at 186–87, 579 P.2d at 671.

This court disagreed with the defendants, stating that, while the district court was correct in refusing to suppress the results of the blood test

Here, the alleged statutory violation lacks constitutional dimensions since Kaeka's fifth amendment rights were not infringed. Consequently, the exclusionary rule does not apply.

3 Haw.App. at 449–50, 653 P.2d at 100–01 (footnote omitted). Insofar as *Kaeka* and *Rossell* can be read broadly as limiting the suppression of illegally obtained evidence only if the statutory violation had "constitutional dimensions," they no longer control.

### C.

Under certain circumstances, this court has since applied the exclusionary rule to evidence obtained in violation of a statute or rule without requiring a constitutional violation. *See Wilson*, 92 Hawai'i at 53–54, 987 P.2d at 276–77 (affirming the trial court's suppression of a driver's blood alcohol content (BAC) result where an arresting officer, in violation of HRS chapter 286's consent requirement, failed to inform the driver of the statutory penalties); *Pattioay*, 78 Hawai'i at 468, 896 P.2d at 924 (holding that suppression of evidence illegally obtained in violation of the Posse Comitatus Act was required by the exclusionary rule).

In *Pattioay*, this court suppressed evidence obtained in violation of the Posse Comitatus Act (PCA), 18 U.S.C. § 1385 (1988). The PCA provides that Army or Air Force personnel may not be used as a posse comitatus or otherwise to execute the laws except in cases and under circumstances expressly authorized by the United States Constitution or an Act of Congress. Penalties are prescribed for violation of the PCA. *See* 78 Hawai'i at 459 n. 5, 896 P.2d at 915 n. 5.[22] In violation of the Act, undercover military police officers targeted civilians suspected of

selling drugs to military personnel and obtained drugs as evidence against the civilians.

Three members of this court (the majority) believed that suppression was warranted "under the authority of this court's supervisory powers in the administration of criminal justice in the courts of our state." *Id.* at 469, 896 P.2d at 925. The majority held that "it is imperative in this case to suppress the evidence obtained in violation of the PCA because to ignore the violation and allow the evidence to be admitted would be to justify the illegality and condone the receipt and use of tainted evidence in the courts of this state." *Id.* In arriving at its holding, the majority said that "actions of the military . . . personnel . . . clearly violated the PCA and were therefore illegal" and that "evidence [thus] obtained" was "tainted." *Id.*

In *Wilson*, this court suppressed the defendant's BAC test result on the ground that the advisement used by the police for requesting the defendant's consent to the test failed to accurately characterize the consequence of taking the test under HRS § 286–261(b) (Supp.1998). In that case, Wilson was informed that "if [he] refuse[d] to take any [BAC] tests[,] . . . [his] driving privileges *will be revoked for one year instead of the three month revocation* that would apply if [he] chose to take the test and failed it." 92 Hawai'i at 47, 987 P.2d at 270 (some emphasis added and some deleted). However, under this court's earlier interpretation of HRS § 286–261(b) in *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 931 P.2d 580 (1997), "Wilson was subject to revocation . . . for three months *to a year* by consenting to and failing [the test]." *Wilson*, 92 Hawai'i at 51, 987 P.2d at 274 (emphasis added). A majority of this court concluded that the

---

in the criminal prosecution because the defendants' failure to comply with the implied consent statute did not " 'violate[ ] any constitutionally protected right[,]' . . . such a determination does not confer legitimacy upon the undeniable violation of the implied consent statute." *Id.* at 187, 579 P.2d at 672 (quoting *People v. Brannon*, 32 Cal.App.3d 971, 108 Cal.Rptr. 620, 623 (1973)).

**22.** 18 U.S.C. § 1385 provided as follows:

 **Use of Army and Air Force as posse comitatus.** Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any

part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both. "The phrase 'posse comitatus' is literally translated from Latin as the 'power of the county' and is defined at common law to refer to all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder." *Pattioay*, 78 Hawai'i at 459 n. 5, 896 P.2d at 915 n. 5 (internal quotation marks and citations omitted).

officer's advice "was inaccurate and misleading and did not fully inform Wilson of the legal consequences of submitting to a blood test." *Id.* at 46, 987 P.2d at 269 (footnote omitted). Viewing the misleading information as "relevant to his decision whether to agree to or refuse the blood alcohol test[,]" the majority concluded that Wilson "did not make a knowing and intelligent decision whether to exercise his statutory right of consent or refusal." *Id.* at 51, 987 P.2d at 274.

As a result, the *Wilson* majority directed that "the arresting officer's violation of HRS chapter 286's consent requirement precludes admissibility of Wilson's blood test results in his related criminal DUI proceeding" and affirmed suppression of the test results, *id.* at 53–54, 987 P.2d at 276–77 (footnote omitted), under this court's supervisory powers as espoused in *Pattioay. See* 78 Hawai'i at 469, 896 P.2d at 925.

## VIII.

The mandate of HRS § 803–9(2) has been the law in this jurisdiction for over sixty years and is representative of like statutes adopted in many states. ABA Project at 23. We would not diminish the gravity of any violation of HRS § 803–9. However, while we have determined that the police did not use reasonable efforts to contact counsel, we must conclude Defendant failed to prove, by a preponderance of evidence, that her statements were "illegally obtained."

▮ In *Pattioay* and *Wilson*, the defendants demonstrated a connection between the statutory violations and the evidence to be suppressed. In *Pattioay,* undercover military police officers targeting civilians in violation of the PCA led to the seizure of drugs, the evidence to be suppressed. In *Wilson,* the inaccurate warning, which violated HRS § 286–263(b), was relevant to the defendant's

decision to take the test. However, on this record, nothing indicates that Defendant's statements were the result of the police officers' failure to exercise reasonable efforts to contact Slaten. Defendant did not testify at the hearing on the motion to suppress, so it cannot be ascertained whether the failure to call her attorney affected her decision to give her statements. Slaten did not testify at the motion to suppress, so it cannot be determined what advice she would have given Defendant, had she been called. Assuming *arguendo* that Slaten would have advised Defendant not to *give* any statement, there is no evidence Defendant would have followed Slaten's advice. Without such links, it is difficult to conclude that Defendant has proven by a preponderance of the evidence that the police officers' violation of HRS S 803–9(2) ultimately had an adverse impact on Defendant's substantive rights.

Rather, according to the evidence, Defendant indicated that she had to "think" about her own and Mika's treatment of Cedra before speaking to the police. The court found in finding of fact No. 18 that "Defendant explained that the reason she did not talk to the detectives initially was because she wanted to get things straight in her mind that it was not her who caused her daughter's death." Subsequently, as found by the court in finding of fact No. 16, Defendant voluntarily initiated contact with the officers for the purpose of talking to them. After being informed of their efforts to contact Slaten, Defendant declined the opportunity offered by the detectives to obtain an attorney or a public defender before giving a statement. According to Wiese, Defendant did not appear distraught at the time of initiating contact with them, and Defendant does not challenge this testimony.

Obviously, our holding does not preclude suppression when warranted for a violation of HRS § 803–9.[23] But we cannot say, under

---

23. Courts have suppressed evidence based on a violation of statutes similar to HRS § 803–9(2). *See Copelin v. State,* 659 P.2d 1206 (Alaska1983); *Commonwealth v. Jones,* 362 Mass. 497, 287 N.E.2d 599 (1972); *Commonwealth v. Bouchard,* 347 Mass. 418, 198 N.E.2d 411 (1964). *See also* Annotation, *Denial of Accused's Request for Initial Contact with Attorney—Drunk Driving Cases,*

18 A.L.R.4th 705 (1982); Annotation, *Denial of Accused's Request for Initial Contact with Attorney—Cases Involving Offenses Other Than Drunk Driving,* 18 A.L.R.4th 743 (1982). Suppression has been justified on the grounds of (1) deterrence of future illegal conduct by police, *see Copelin,* 659 P.2d at 1214–15, and (2) effectuation of a statute in the absence of a prescribed

the particular circumstance of this case, that the statements sought to be suppressed resulted from the police's failure to place Defendant in touch with counsel.

## IX.

 As initially noted, Defendant also argues that she did not waive her *Miranda* rights voluntarily, knowingly, and intelligently because Hee misled her when he made the following statement:

Q. [Hee] And yesterday, Detective Wiese made *numerous attempts* to contact [Slaten] and there's no number listed that works for her. Would you like to have a *Public Defender* here?

A. [Defendant] No.

(Emphases added.) Defendant asserts that the reference to "numerous attempts" was a misrepresentation because Wiese only called the same number twice on two different occasions and, further, that she was misled into believing that her right to an attorney was limited to a "public defender."

We agree that dialing the same number twice at two different times does not amount to "numerous attempts." However, Hee's statement was not false insofar as he indicated that there was "no number listed that work[ed.]" Defendant herself stipulated that the number listed in the telephone book was disconnected. Thus, we cannot conclude that Hee's statement was wholly misleading.

 Nor can we concur in the suggestion that reference to the public defender misadvised her. After this reference, Hee again repeated that Defendant "ha[d] a right to have an *attorney* present while [they] talk[ed] to [her]" and that "if [she] c[ould] not afford an attorney, the court w[ould] appoint one for [her], prior to any questioning." (Emphasis added.) This plainly offered Defendant the option of having her own paid attorney or one paid by the court, such as a public defender, present during her interrogation.

 Contrary to Defendant's assertions, the circumstances indicate that Defendant voluntarily, knowingly, and intelligently waived her "*Miranda* rights." "After a defendant has been adequately apprised of his [or her] *Miranda* rights, he [or she] may waive effectuation of these rights provided the waiver is made voluntarily, knowingly, and intelligently." *State v. Gella*, 92 Hawai'i 135, 143, 988 P.2d 200, 208 (1999) (internal quotation marks, brackets, and citations omitted). This court has held that "the validity of a waiver concerning a fundamental right is reviewed under the totality of the facts and circumstances of the particular case." *State v. Friedman*, 93 Hawai'i 63, 69–70, 996 P.2d 268, 274–75 (2000) (citing *State v. Luton*, 83 Hawai'i 443, 454, 927 P.2d 844, 855 (1996) (noting that a waiver of a defendant's *Miranda* rights is examined from the entire record and under the totality of the circumstances) (citations omitted), and *State v. Merino*, 81 Hawai'i 198, 221, 915 P.2d 672, 695 (1996) (noting that, in determining whether waiver of fundamental right to attorney was voluntarily undertaken, this court would look to totality of facts and circumstances of particular case)). Hee asked Defendant if anyone had approached her to ask for a statement and if anyone threatened her into talking to him. Defendant replied, "No." He then informed Defendant of her *Miranda* rights using HPD Form 81 as follows:

Q. [Hee] Okay, Jennifer, this is the same type of form we went over yesterday. It's HPD 81. The form is entitled, "Warning Persons Being Interrogated Of Their Constitutional Rights". I'm going to read this form to you. You read along silently and initial your answers and answer out loud, okay?

A. [Defendant] Yeah.

Q. [Hee] You have any problems reading or anything?

A. [Defendant] No.

Q. [Hee] Jennifer Edwards, do you know you're in the custody of Detective A. Hee and Detective Mark Wiese—M. Wiese, at the Honolulu Police Station?

A. [Defendant] Yes.

penalty. *See Jones*, 287 N.E.2d at 603; *Bouchard*, 198 N.E.2d at 413. However, in these cases, the defendants did not withdraw their request for counsel.

Q. [Hee] Put your initials in the correct answer. I'm going to ask you questions about a murder which occurred on or prior to 12–17–97 at 2888 Ala Ilima Street, Number 608. But first I want to inform you of certain rights you have under the Constitution. Before I ask you any questions, you must understand your rights. *You have a right to remain silent. You don't have to say anything to me or answer any of my questions.* Anything you say may be used against you at your trial. *You have a right to have an attorney present while I talk to you. If you cannot afford an attorney, the court will appoint one for you, prior to any questioning.* If you decide to answer my questions without an attorney being present, you still have the right to stop answering at any time. *Do you want an attorney now?*

A. [Defendant] *No.*

Q. [Hee] *Do you understand what I have told you?*

A. [Defendant] *Yes.*

Q. [Hee] Would you like to tell me what happened?

A. [Defendant] Yes.

Q. [Hee] Sign the form at the bottom.

A. [Defendant] (inaudible).

(Emphases added.) Defendant initialed HPD Form 81 as she had answered orally. In light of "the totality of the facts and circumstances of [this] case," we conclude that Defendant waived her *Miranda* rights voluntarily, knowingly, and intelligently.

### X.

██ Finally, Defendant contends that the court erred in concluding that the statements in which she admitted to physically abusing Cedra prior to her death were voluntarily made. She argues that (1) Hee's statement that Wiese made "numerous attempts" to reach Slaten and his inquiry regarding a "public defender" were "deliberate falsehoods" and (2) these "deceptive" statements by the police were coercive per se under *Kelekolio, supra,* and, thus, rendered her statements involuntary. Alternatively, Defendant maintains that her statements to the

police were not voluntary under the totality of the circumstances.

### A.

In this case, Defendant was given *Miranda* warnings on four occasions: (1) on December 17, 1997, the day of her arrest, (2) in the morning on December 18, 1997, (3) at around 6:00 p.m. on December 18, 1997, and (4) at around 8:00 p.m. on December 18, 1997. On the first occasion, Defendant refused to talk and requested Slaten. On the second occasion, after Defendant's request to speak, Hee and Wiese obtained a statement from her. On the third occasion, Luke conducted a polygraph examination. On the fourth occasion, Hee and Wiese took another statement from Defendant.

██ The statements Defendant claims to be involuntary were made in the first interrogation, conducted after the second *Miranda* warning. Because "the 'fruit of the poisonous tree' doctrine prohibits the use at trial of evidence that comes to light as a result of the exploitation of a previous illegal act of the police[,]" *State v. Fukusaku,* 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997), we examine the second *Miranda* warning made on the morning of December 18, 1997.

We apply a de novo standard of appellate review to the ultimate issue of the voluntariness of a confession. We thus examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of the circumstances surrounding the defendant's statement.

*Gella,* 92 Hawai'i at 142, 988 P.2d at 207 (brackets and citations omitted).

In *Kelekolio,* this court adopted the rule

that employment by the police of deliberate falsehoods intrinsic to the facts of the alleged offense in question will be treated as one of the totality of circumstances surrounding the confession or statement to be considered in assessing its voluntariness; on the other hand, deliberate falsehoods extrinsic to the facts of the alleged offense, which are of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession re-

gardless of guilt, will be regarded as coercive per se, thus obviating the need for a "totality of circumstances" analysis of voluntariness.

74 Haw. at 511, 849 P.2d at 73. After noting that the rule must "be applied on a case-by-case basis," *id.,* this court listed examples of intrinsic falsehoods that "would include such misrepresentations regarding the existence of incriminating evidence," *id.,* and examples of extrinsic falsehoods that were "of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt." [24] *Id.* at 512, 849 P.2d at 73.

In *Kelekolio,* the police officer who interviewed the defendant acknowledged that he had falsely stated that the police possessed physical evidence incriminating the defendant and that bruises on the victim's arms and legs indicated that force had been used. *Id.* at 489, 849 P.2d at 64. The police officer admitted that the statements he made were "deliberate lies ... designed to elicit a truthful statement from [the defendant]." *Id.* Based on the rule adopted, quoted above, this court concluded that the police officer's false statements were "intrinsic" misrepresentations and, based on the totality of circumstances, were not of a type that would reasonably induce a false confession. *Id.* at 513, 849 P.2d at 74. Accordingly, the deception practiced by the police did not render the defendant's statements involuntary. *Id.*

Hee's "numerous attempts" and "public defender" statements are not "misrepresentations regarding the existence of incrimina-

ting evidence" and, thus, are not intrinsic falsehoods. Neither were Hee's statements "deliberate falsehoods extrinsic to the facts of the alleged offense, which [were] of a type reasonably likely to procure an untrue statement or to influence [Defendant] to make a confession regardless of guilt." *Id.* at 511, 849 P.2d at 73. Assuming *arguendo* that Hee's statements were deliberate falsehoods, they might produce a belief in Defendant that she could no longer have Slaten as an attorney, or that her option as to legal representation was limited to a public defender, if viewed in isolation.

However, in light of the *Miranda* warning given after Hee's remarks and her rejection of representation at that point, it cannot reasonably be concluded that Defendant was misled into believing that any request for counsel was futile, or that a public defender was the only counsel available to her and that, as a consequence, she was induced to confess. Hee's statements were not "of a type reasonably likely to procure an untrue statement or to influence [Defendant] to make a confession regardless of guilt." *Id.* Hence, they cannot "be regarded as coercive per se[.]" *Id.*

### B.

We must examine Defendant's argument that "[the] 'totality of circumstances' analysis" indicates that her statements were involuntary. She points to the following circumstances: (1) her request to see Slaten was apparently futile; (2) after making the request for an attorney, she had been locked

---

**24.** Examples of intrinsic falsehoods listed in *Kelekolio* included the following:
(1) placement of the defendant's vehicle at the crime scene, (2) physical evidence linked to the victim found in the defendant's car, (3) discovery of the murder weapon, (4) a claim that the murder victim [was] still alive, (5) presence of the defendant's fingerprints on the getaway car or at the crime scene, (6) positive identification of the defendant by reliable witnesses, and (7) discovery of a nonexistent witness.
74 Haw. at 511–12, 849 P.2d at 73 (citations omitted). This court listed the following examples of extrinsic falsehoods reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt:
(1) assurances of divine salvation upon confession, (2) promises of mental health treatment

in exchange for a confession, (3) assurances of treatment in a "nice hospital" (in which the defendant could have his personal belongings and be visited by his girlfriend) in lieu of incarceration, in exchange for a confession, (4) promises of more favorable treatment in the event of a confession, (5) misrepresentations of legal principles ..., and (6) misrepresentations by an interrogating police officer, who [was] a close friend of the defendant, that the defendant's failure to confess will get the officer into trouble with his superiors and jeopardize the well-being of the officer's pregnant wife and children.
*Id.* at 512–13, 849 P.2d at 73–74 (citations omitted).

up for almost eighteen hours under video surveillance; (3) her emotional state was so fragile as to warrant a suicide watch; (4) she broke down in tears more than once during the interrogations; and (5) she was only eighteen years old.

However, Defendant does not explain, in light of the warnings given her, how such circumstances specifically affected the voluntariness of her statements. Again, prior to the interrogation, the police informed Defendant that, although they could not contact Slaten, she had a right to an attorney or a public defender and that she would be provided one if she could not afford an attorney. She chose to waive that right, not once, but three times. Indeed, according to her, her initial resistance in speaking to the police stemmed from her need "to think" about her and Mika's treatment of Cedra. *See supra* page 229, 30 P.3d page 243. Based on a de novo review of the totality of circumstances, we cannot conclude that the court was wrong in determining that Defendant's statements were voluntary.

## XI.

For the reasons stated above, we affirm the August 10, 1999 judgment herein.